THE OHIO LIFE INSURANCE AND TRUST COMPANY, PLAINTIFF IN ERROR, *v.* HENRY DEBOLT, TREASURER OF HAMILTON COUNTY, DEFENDANT IN ERROR.

There being no opinion of the court, as such, in this case, the reporter can only state the laws of Ohio which were drawn into question.

In 1834, the Legislature of Ohio passed an act incorporating the Ohio Life Insurance and Trust Company, with power, amongst other things, to issue bills or notes until the year 1843. One section of the charter provided that no higher taxes should be levied on the capital stock or dividends of the company than are or may be levied on the capital stock or dividends of incorporated banking institutions in the State.

In 1836, the legislature passed an act to prohibit the circulation of small bills. This act provided, that if any bank should surrender the right to issue small notes, the treasurer should collect a tax from such bank of five per cent. upon its dividends; if not, he should collect twenty per cent. The Life Insurance and Trust Company surrendered the right.

In 1838, this law was repealed.

In 1845, an act was passed to incorporate the State Bank of Ohio and other banking companies. The 60th section provided that each company should pay, annually, six per cent. upon its profits, in lieu of all taxes to which such company or the stockholders thereof, on account of stocks owned therein, would otherwise be subject.

In 1851, an act was passed to tax banks and bank and other stocks, the same as other property was taxable by the laws of the State.

There was nothing in previous legislation to exempt the Life Insurance and Trust Company from the operation of this act.

THIS case was brought up from the District Court of the State of Ohio, in and for the county of Hamilton, by a writ of error issued under the 25th section of the Judiciary Act. The court was held by the Honorable John A. Corwin, Chief Justice of the Supreme Court of the State of Ohio, presiding, and the Honorable Alfred G. W. Carter, and the Honorable Edward Woodruff, and the Honorable John B. Stalle, Judges of the Court of Common Pleas, in and for the county of Hamilton, associates.

The following certificate, which was a part of the record, explains the nature of the case :

And thereupon, on motion of the counsel for the said The Ohio Life Insurance and Trust Company, defendants, it is ordered to be certified and made a part of the record that the said company did set up, by way of defence to the prayer of the bill of complainants, a certain act of the general assembly of this State, entitled An act to incorporate the Ohio Life Insurance and Trust Company, passed the twelfth day of February, in the year eighteen hundred and thirty-four ; and also a certain other act of the general assembly, entitled An act to prohibit the circulation of small bills, passed the fourteenth day of March, in the year eighteen hundred and thirty-six ; and thereupon

claimed, that in virtue of the said acts, and of the instrument of writing, " Exhibit B," attached to its answer, the general assembly of this State had entered into a contract with the said company never to impose upon the property of the said company a greater or different burden of taxation than five per cent. upon its dividends of net profits, and that therefore the act of the general assembly, entitled An act to tax banks, and bank and other stocks, the same as other property is now taxable by the laws of this State, passed the twenty-first day of March, in the year eighteen hundred and fifty-one, impaired the obligation of a contract, and therein was repugnant to the Constitution of the United States; but the court decided that there was no conflict between the said several acts, for the reason that the said act passed the fourteenth day of March, in the year eighteen hundred and thirty-six, expired, and ceased to have any effect or operation as respects The Ohio Life Insurance and Trust Company, on the first day of January, in the year eighteen hundred and forty-three, when the power of the said company to issue bills or notes for circulation expired and ceased by the terms of the said act passed the twelfth day of February, in the year eighteen hundred and thirty-four; and that there was, therefore, at the date of the said act passed the twenty-first day of March, in the year eighteen hundred and fifty-one, no such contract, agreement, pledge, or understanding as the said company claimed; and that the said act passed the twenty-first day of March, in the year eighteen hundred and fifty-one, was, in that respect, constitutional and valid; and it was ordered to be further certified on the same motion, that the said company did likewise set up by way of defence to the prayer of said bill a certain act of the general assembly of this State, entitled An act to incorporate the State Bank of Ohio and other banking companies, passed the twenty-fourth day of February, in the year eighteen hundred and forty-five, and thereupon claimed that in virtue of the said last-mentioned act, and of the said act passed the twelfth day of February, in the year eighteen hundred and thirty-four, the general assembly of this State had entered into a contract with the said company not to impose upon the property of the said company a greater or different burden of taxation than six per cent. upon its dividends of net profit, until after the first day of May, in the year eighteen hundred and sixty-six, and that therefore the act of the said general assembly, entitled An act to tax banks, and bank and other stocks, the same as other property is now taxable by the laws of this State, passed the twenty-first day of March, in the year eighteen hundred and fifty-one, impaired the obligation of a contract, and therein was repugnant to the Constitution of the United States;

but the court decided that the said act passed the twenty-fourth day of February, in the year eighteen hundred and forty-five, contained no pledge on the part of the State not to alter the amount, or the mode of taxation therein specified, but that the taxing power of the general assembly of this State over the property of companies formed under that act, was and is the same as over the property of individuals, and that there was, consequently, no such contract, agreement, pledge, or understanding as the said company claimed; and that whether the franchises of companies organized under the said last-mentioned act, could not be revoked, changed, or modified, the said act passed the twenty-first day of March, in the year eighteen hundred and fifty-one, did not, upon any construction, impair any right secured to such companies, by the said act passed the twenty-fourth day of February, in the year eighteen hundred and forty-five, and that the said act passed the twenty-first day of March, in the year eighteen hundred and fifty-one, was therefore a constitutional and valid law. And it is ordered to be certified, also, that the question of the validity of the said act passed the twenty-first day of March, in the year eighteen hundred and fifty-one, was material and necessary to the decision of this cause, and that the validity of the said act was drawn in question (in the manner and to the intent herein before specified) as being repugnant to the Constitution of the United States, and that the decision of the court was in favor of the validity of the said law. And it is further certified that this court is the highest court of law and in equity in the State of Ohio, in which a decision in this suit can be had.

The several acts mentioned in the above certificate, are stated in the opinions delivered by the judges of this ec rt, and it is not necessary to set them forth *in extenso.*

The case was argued by *Mr. Worthington* and *Mr. Stanberry*, for the plaintiff in error, and by *Mr. Spalding* and *Mr. Pugh*, for the defendant in error.

The following points, on behalf of the plaintiff in error, are taken from the brief of Mr. Worthington, filed for himself and Mr. Mathews.

*Points for Plaintiff.*—I. Our first point involves the taxing power, the objects and subjects of taxation, and the manner and extent of its exercise. This power, under the Constitution of Ohio, of 1802, is legislative, and placed under the control of the general assembly, subject only to the few limitations put upon it by the instrument of its creation, and by the Constitution of the United States. Constitution of Ohio, of 29th of Nov. 1802, Art. 1, § 1; Ib. Art. 8, § 23; McCulloch *v.* State

of Maryland, 4 Cond. Pet. Rep. 475, 486; Nathan v. Louisiana, 8 How. Rep. 82; Mager v. Grima et al. 8 Ib. 490; The People v. Mayor, &c. of Brooklyn, 4 Coms. Rep. 419, 423; Loring et al. v. The State of Ohio, 16 Ohio Rep. 590; Gazlay v. The State of Ohio, 5 Ib. 14; State of Ohio v. Hibbard, 3 Ib. 63; License Cases, 5 How. Rep. 516, 593; Loughborough v. Blake, 4 Cond. Pet. Rep. 660; Prov. Bank v. Billings, 4 Pet. Rep. 563; 1 Ohio State Rep. 102.

II. The only limitation placed upon the exercise of the taxing power is by the 23d section of the 8th article of the constitution of Ohio, which declares, "That the levying taxes by the poll is grievous and oppressive; wherefore the legislature shall never levy a poll-tax for county or state purposes." This being the only limit, the power can be exercised to any and every extent, for any and every purpose, and upon any and every object or thing, at discretion, subject only to the limitation given. Constitution of Ohio of 29th of November, 1802, Art. 8, § 23; McCulloch v. State of Maryland, 4 Cond. Pet. Rep. 475, 488; Osborne v. Bank United States, 5 Ib. 771; Nathan v. Louisiana, 8 How. Rep. 82; Mayer v. Grima et al. 8 Ib. 490; The License Cases, 5 Ib. 593; Gazlay v. State of Ohio, 5 Ohio Rep. 21; Loring et al. v. The State of Ohio, 16 Ib. 590; People v. Mayor, &c. of Brooklyn, 4 Coms. Rep. 426; 1 Ohio State Rep. 77, 102.

III. The taxing power comes to the legislature from the people, and is measured by the authority the people possess and can confer upon their government, and have actually conferred. Their authority being unlimited, as to themselves and their resources, and their exigencies without bounds, they can exercise this power at will and at discretion, without limit or measure, as to themselves and their property. And if they confer the authority they have upon their general assembly or legislative department of their government with or without limit, it can be exercised within the grant, just as the people themselves could have exercised it. McCulloch v. State of Maryland, 4 Cond. Pet. Rep. 484; Loughborough v. Blake, 4 Ib. 660; Osborne v. Bank United States, 5 Ib. 771; Weston et al. v. City of Charleston, 2 Ib. 465; Providence Bank v. Billings et al. 4 Ib. 559; Charles River Bridge v. Warren Bridge, 11 Pet. Rep. 546, 567; Vaughn v. Northup et al. 15 Ib. 4; Dobbins v. Com. of Erie County, 16 Ib. 447; License Cases, 5 How. Rep. 575, 588, 592, 627; West River Bridge v. Dix et al. 6 Ib. 523, 539; Passenger Cases, 8 Ib. 407, 421, 447, 530, 531; Nathan v. Louisiana, 8 Ib. 80, 82; Mayer v. Grima et al. 8 Ib. 490; The People v. Mayor, &c. Brooklyn, 4 Coms. Rep. 419; 1 Ohio State Rep. 10.

IV. The legislative power of a State, as given by its constitution, can be exercised only upon what belongs to the State in actual or constructive right, and can never extend to what belongs to another government. The same person or thing cannot at the same time be under the power of both. Vaughn v. Northup et al. 15 Pet. Rep. 1; McCulloch v. Rodrick, 2 Ohio Rep. 234; Rogers et al. v. Allen, 3 Ib. 488; Mager v. Grima et al. 8 How. Rep. 490; Holmes v. Remsen, 20 Johns. Rep. 254; Gordon v. Appeal Tax, 3 How. Rep. 150.

V. The charter of The Ohio Life Insurance and Trust Company, and the charter of the State Bank of Ohio, and other banking companies, are contracts obligatory upon the State of Ohio, in all their parts, and as such, protected by the Constitution of the United States, from violation or invasion, upon the part of the State of Ohio. Constitution of the United States, Art. 1, § 10; Fletcher v. Peck, 2 Con. Pet. Rep. 321; New Jersey v. Wilson, 2 Ib. 457; Terett et al. v. Taylor et al. 3 Ib. 256; Town of Pawlet v. Clark et al. 3 Ib. 408; Sturgis v. Crowninshield, 4 Ib. 415; Dartmouth College v. Woodward, 4 Ib. 538; McCulloch v. State of Maryland, 4 Ib. 470; Providence Bank v. Billings, 4 Pet. Rep. 559; Charles River Bridge v. Warren Bridge, 11 Ib. 540, 611; Gordon v. Appeal Tax, 3 How. Rep. 133; Planters Bank v. Sharp et al. 6 Ib. 318; West River Bridge v. Dix, 6 Ib. 531, 536, 539, 542; Paup et al. v. Drew, 10 Ib. 218; Woodruff v. Trapnall, 10 Ib. 204, 208, 214; Baltimore and Susquehanna Railroad Company v. Nesbit, 10 Ib. 395; East Hartford v. Hartford Bridge, 10 Ib. 535.

VI. The 25th section of the charter of The Ohio Life Insurance and Trust Company, and the 60th section of the charter of the State Bank of Ohio, and other Banking companies, are contracts, limiting the exercise of taxation upon the part of the State, and, as such, are protected by the Constitution of the United States from invasion. Constitution of the United States, Art. 1, § 10; Fletcher v. Peck, 2 Con. Pet. Rep. 231; New Jersey v. Wilson, 2 Ib. 457; Providence Bank v. Billings et. al. 4 Ib. 559; Charles R. Bridge v. Warren Bridge, 11 Ib. 540; Gordon v. Appeal Tax, 3 How. Rep. 133, 146; West Bridge v. Dix et al. 6 Ib. 531, 544; Woodruff v. Trapnell, 10 Ib. 207, 208; Mills v. St. Clair Co. 8 Ib. 580.

VII. The 25th section of the charter of The Ohio Life Insurance and Trust Company, being a contract prohibiting higher taxes upon the property or dividends of the Company, other than were, or might be levied on the property or dividends of incorporated banking institutions of the State, no higher tax could be levied upon the property, or dividends

of the company than could be levied upon the property or dividends of incorporated banks of the State. A question arises as to the banking institutions here referred to. The reference must be to incorporated banks, existing at the time the charter was enacted, or that may exist at the time of the levy. In either case, no higher tax could be levied against the company than could be levied against such incorporated banks. If such banks be subject to different rates of taxation, then the prevailing rates of the greater proportion of such institutions, would control the rates of taxation against the company. If the former rule prevail, then the rate of taxation against the old banks in Ohio furnishes the rule against the company; but if the latter rule prevail, then the rate of taxation against the State Bank of Ohio, and other banking companies, under the 60th section of their charter of the 24th of February, 1845, furnishes the rule of taxation against the company. The act to authorize free banking, of 21st March, 1851, (49 Gen. Laws of Ohio, 41,) has no application to the present tax, because, aside from other considerations, no banks were organized under it when the tax against the company was authorized to be assessed, under the act of 21st March, 1851, to tax banks, &c. 49 Gen. Laws of Ohio, 56; 44 Ib. 108, 121, sec. 60; 48 Ib. 88.

VIII. All the banking institutions in operation in Ohio, at the time The Ohio Life Insurance and Trust Company was chartered, except the Commercial Bank of Cincinnati, which paid four per cent. on her dividends, — and the Franklin Bank of Cincinnati, which paid five per cent. upon her dividends — were, by their charters, not exempt from general taxation under a general law. And all the banks incorporated at the same session of the general assembly in which The Ohio Life Insurance and Trust Company was incorporated, were by their charters made subject to the tax imposed by the act of 12th March, 1831, to tax banks, &c., (Swan's Statutes, 916,) and such taxes as might be imposed by law. The Ohio Life Insurance and Trust Company prior to July, 1836, that is, in 1835, was taxed under the act of 12th March, 1831, if taxed at all, five per cent. upon her dividends. 3 Chase Stat. 2010 to 2083, c. 100–133, inclusive; 2 Ib. 913–924, c. 351, § 42, 1463, c. 655; 32 Local Laws of Ohio 76, § 21, Bank of Wooster; 32 Ib. 197, § 21, Bank of Massillon; 32 Ib. 283, § 6, Bank of Xenia; 32 Ib. 293, § 17, Bank of New Lisbon; 32 Ib. 299, § 6, Lafayette Bank of Cincinnati; 32 Ib. 407, § 22 Bank of Cleveland; 32 Ib. 412, § 6, Bank of Sandusky, 32 Ib. 419, § 6, Clinton Bank of Columbus.

IX. The Ohio Life Insurance and Trust Company must de-

clare dividends on the first Mondays in January and July, annually, from the profits of said company, so as not to impair, or in anywise lessen the capital stock. These dividends are upon the entire profits of the company, and are not divisible, or declared separately from any special business of the company. Charter of The Ohio Life Insurance & Trust Co. § 27.

X. The Ohio Life Insurance and Trust Company, and all the banks in Ohio, except the Commercial Bank of Cincinnati, and the Franklin Bank of Cincinnati, being bound to report to the Auditor of State, under the act of 12th March, 1831, to tax banks, &c., were embraced in the act of 14th March, 1836, " To prohibit the circulation of small bills," as that act, in express terms, included all banks that made returns to the auditor of State under said act of 12th March, 1831, to tax banks, &c. 34 Gen. Laws of Ohio, 42, § 1, of the act to prohibit the circulation of small bills.

XI. All banks, including The Ohio Life Insurance and Trust Company, coming under the act of 14th March, 1836, " to prohibit the circulation of small bills," were, by the terms of the act and their charters, subject to a tax of twenty per cent. upon their dividends, unless they surrendered by the 4th July, 1836, as therein directed, their rights to issue or circulate notes or bills, less than $3, after 4th July, 1836, and $5, after 4th July, 1837; and "then and in that case, the Auditor of State shall thereafter draw on such banks only for the amount of five per cent. upon their dividends, declared after such surrender." The act of 14th March, 1836, repealed so much of the act of 12th March, 1831, to tax banks, &c. as was inconsistent with it. 32 General Laws of Ohio, 42; Mills v. St. Clair County, 8 How. Rep. 581.

XII. The Ohio Life Insurance and Trust Company having accepted the provisions of the act of 14th March, 1836, " to prohibit the circulation of small bills," and made the surrender in due form required by said act, is entitled to the benefit or consideration tendered by said act to obtain said surrender, and can be taxed only five per cent. upon her dividends declared after such surrender. This surrender upon her part, under said act, constitutes a valid contract between her and the State, and its invasion is prohibited by the Constitution of the United States. Gordon v. Appeal Tax, 3 How. Rep. 133; Woodruff v. Trapnall, 10 Ib. 204; Rich. R. R. Co. v. Lou. R. R. Co. 13 Ib. 81, 86, 90; Searight v. Stokes, 3 Ib. 167; Neil, Moore & Co. v. Ohio, 3 Ib. 742; Achison v. Huddleson, 12 Ib. 296; Huidekeper v. Douglas, 1 Con. Pet. Rep. 452; U. States v. Fisher, 1 Ib. 423; Sturgis v. Crowninshield, 4 Ib. 418, 481.

XIII. The Supreme Court of the United States, as a general

rule, in the construction of the statutes and constitutions of the States, follows the construction of their courts, but when the construction of a statute in conflict with the Constitution of the United States is involved, then the rule is reversed, and the State courts must follow the construction given to the statute by the Supreme Court of the United States. Luther v. Bowen, 7 Howard's Rep. 1, 40, 219, 818; East Hartford v. Hartford Bridge Co. 10 Ib. 539; Strader et al. v. Graham, 10 Ib. 94; Elmendorf v. Taylor, 6 Con. Pet. Rep. 50; Swift v. Lyson, 16 Pet. Rep. 1; 2 Ib. 378.

XIV. The repeal of the act of 14th March, 1836, "to prohibit the circulation of small bills," by the act of 13th March, 1838, (36 General Laws of Ohio, 55,) does not annul or abrogate the contract of surrender of 22d June, 1836, made by The Ohio Life Insurance and Trust Company, by which she lost the right to issue and circulate small notes, and the State lost the right thereafter to tax her beyond five per cent. on her dividends. Woodruff v. Trapnell, 10 How. Rep. 204, 206, 207; East Hartford v. Hartford Bridge Co. 10 Ib. 535; Briscoe v. Bank of Com. of Ky. 11 Pet. Rep. 257; Charles R. Bridge v. War. Bridge, 11 Ib. 420; Balt. & Susq. R. R. v. Nesbitt, 10 How. Rep. 395; Satterlee v. Matthewson, 2 Pet. Rep. 412; Bronson v. Kinzie et al. 1 How. Rep. 311; Watson et al. v. Mercer, 8 Pet. Rep. 110; Fletcher v. Peck, 2 Con. Pet. Rep. 321; Neil, Moore & Co. v. Ohio, 3 Howard's Rep. 742; Acheson v. Huddleson, 12 Ib. 296; 10 Ib. 395, 402.

For the defendant in error, the points will be given as stated by *Mr. Spalding*, and also the third and fourth points of *Mr. Pugh*.

*Mr. Spalding's* points for defendant in error.

*First.* The taxing power is of such vital importance, and is so essentially necessary to the very existence of a State government, that its relinquishment or diminution for a fixed period, cannot be made the subject-matter of a binding contract between the legislature of a State, and individuals or private corporations. It is one of the highest attributes of sovereignty, and under our form of government, belongs to the people. They have lodged it in the hands of the law-making power, to be exerted for their benefit, not to be impaired or destroyed. It must of necessity always be exerted according to present exigencies, and therefore must necessarily continue to be held by each succeeding legislature undiminished and unimpaired.

*Second.* The act of the general assembly of the State of Ohio, entitled " An act to incorporate the State Bank of Ohio and other banking companies," passed February 24, 1845, is not

a contract in the sense in which that term is used in the Constitution of the United States, Art. 1, § 10. It is a general law upon the subject of banking; it prescribes rules for the government of all the citizens of the State who may choose, within certain limits, to embark in the business of banking, and is as mandatory in its character as any law upon the statute book. These mandates are some of them enforced under the severest penalties known to the law.

*Third.* This act was made subject to alteration, suspension, and repeal, for, at the time of its enactment, February 24, 1845, there was a general law in full force in Ohio, which was passed March 7, 1842, entitled "An act instituting proceedings against corporations not possessing banking powers and the visatorial powers of courts, and to provide for the regulation of corporations generally," that provided in section nine as follows: "That the charter of every corporation of every description, 'whether possessing banking powers or not,' that shall hereafter be granted by the legislature, shall be subject to alteration, suspension, and repeal, in the discretion of the legislature." Ohio Laws, vol. 40, page 70.

*Fourth.* The 60th section of the act of February 24th, 1845, provides only a measure of taxation for the time being, and does not relinquish the right to increase the rate as the future exigencies of the State may require.

*Fifth.* The record shows (pages 24, 25) that the Supreme Court of the State decided nothing more than that the proviso to the act of March 14, 1836, ceased to affect the plaintiff when the power to issue bills for circulation ceased in January, 1843; and that the act of February 24, 1845, contained no pledge on the part of the State not to alter the amount and mode of taxation therein specified. And in so doing, said court has done no more than to give a construction to the statutes of Ohio. With such a construction, this court has always manifested a reluctance to interfere. But more especially will it feel that reluctance when such interference may bring the acts of the State legislature in conflict with the Constitution of the United States.

*Mr. Pugh's* third and fourth points.

III. The Supreme Court of Ohio rightly construes the statutes.

1. The proviso to the first section of the act " to prohibit the circulation of small bills," passed March 14th, 1836, does not contain any stipulation or promise. It merely exempted such banks as complied with its terms, before a certain day, from the operation of the principal clause. Minis *v.* The United States, 15 Pet. Rep. 445; The Commissioners of Kensington *v.* Keith,

2 Penn. State Rep. 220; The Treasurer of Vermont v. Clark, 19 Vermont Rep. 129.

2. The proviso does not operate as a contract, or stipulation, merely because the consent of the banks is invoked. The Cincinnati, Wilmington, and Zanesville Railroad Company v. The Commissioners of Clinton County, 21 Ohio Rep. 77; The Cargo of the Brig Aurora v. The United States, 7 Cranch, 382.

3. The benefit of the proviso (if construed as a contract) only applied to the plaintiff in error, whilst it was authorized, by its charter, to issue bills or notes for circulation. Hildebrand v. Fogle, 20 Ohio Rep. 147; Bradley v. The Washington, Alexandria, and Georgetown Steam Packet Company, 13 Pet. Rep. 97; Synder v. Leibengood, 4 Penn. State Rep. 308; Washburn v. Gould, 3 Story, 162; Case v. Cushman, 3 Watts & S. 544; The Commercial Bank v. Pleasants, 6 Wharton, 375; Loring v. The City of Boston, 7 Metcalf, 409; Robinson v. Fiske, 25 Maine Rep. 405; Brown v. Slater, 16 Conn. Rep. 192; Porter v. Breckenridge, Hardin, 26; Sayre v. Peck, 1 Barbour's S. C. Rep, 468, 469. And see 5 Cruise's Digest, 44, 45; Bozoun's Case, 4 Rep. 35; Case of the Abbot of Strata Mercella, 9 Rep. 30; Ford and Sheldon's Case, 12 Rep. 2; The Earle of Shrewsbury's Case, 9 Rep. 46.

4. The sixtieth section of the act " to incorporate the State Bank of Ohio and other banking companies," passed February 24th 1845, provides only a present measure and system of taxation, and does not relinquish, expressly or impliedly, the power of the State to alter the measure, as well as the system, at any future period. The Commonwealth v. The Easton Bank, 10 Penn. State Rep. 442; Bank of Pennsylvania v. The Commonwealth, 19 Penn. State Rep. 144; Brewster v. Hough, 10 New Hampshire Rep. 138; The Richmond Railroad Company v. The Louisa Railroad Company, 13 How. Rep. 71; Shorter v. Smith, 9 Georgia Rep. 517; Armstrong v. The Treasurer of Athens County, 16 Pet. Rep. 281; The Providence Bank v. Billings, 4 Ib. 514.

The following cases are distinguishable: Gordon v. The Appeal Tax Court, 3 Howard, 133; The Union Bank v. The State, 9 Yerger, 490; Johnson v. The Commonwealth, 7 Dana, 338; The State v. Berry, 2 Harrison, 80; Municipality Number One v. The Louisiana State Bank, 5 Louis. Annual Rep. 394; The Mayor of Baltimore v. The Baltimore and Ohio Railroad Company, 6 Gill, 288.

Statutes of Ohio, in pari materia, to be examined: Act " To tax bank, insurance and bridge companies," passed March 12th, 1831, section 1st, Swan's Statutes, 916, 917. Act " For levying taxes on all property in this State according to its true

36 *.

value," passed March 2d, 1846, sect. 10th, 44 General Laws, 90, 91. Act " To exempt revolutionary soldiers from taxation," passed February 8th, 1847, 45 General Laws, 51. Act " To exempt from taxation a branch of the New York Methodist Episcopal Church Book Concern in Cincinnati and for other purposes," passed February 17th, 1834, 32 Local Laws, 91. Act " To incorporate The Milan and Richland Plank Road Company," passed January 31st, 1845, section 9th, 43 Local Laws, 51. See, also, The Constitution of Ohio, adopted June 17th, 1851, article first and section second; article twelfth and sections second and third; article thirteenth and section fourth. Constitution of Ohio, adopted November 29th, 1802, article eighth and sections first, eighteenth, nineteenth, twenty-fourth, twenty-seventh, and twenty-eighth. As to the effect of these provisions in construing both the act of March 14th, 1836, and the act of February 24th, 1845, see Rex v. Loxdale, 1 Burrow, 447.

5. It does not follow, because the provision was made part of an act to incorporate the State Bank of Ohio and other banking companies, that the design was to create a permanent measure or system of taxation. The Preble County Bank. v. Russell, 21 Ohio Reports, 313; The Bank of Columbia v. Okely, 4 Wheaton, 235; Young v. The Bank of Alexandria, 4 Cranch, 397; Crawford v. The Bank of Mobile, 7 Howard, 279; The Baltimore and Susquehanna Railroad Company v. Nesbit, 10 How. 396.

6. All grants in derogation of common right (including all exemptions from the payment of taxes) must be strictly construed. The Proprietors of the Charles River Bridge v. The Proprietors of the Warren Bridge, 11 Peters, 545, 546; The Providence Bank v. Billings, 4 Peters, 561; The United States v. Arredondo, 6 Peters, 738; Mills v. St. Clair County, 8 How. 581; Perrine v. The Chesapeake and Delaware Canal Company, 9 How. 185; The Cincinnati College v. The State, 19 Ohio Reports, 110; The Richmond Railroad v. The Louisa Railroad, 13 How. 81.

IV. The right of taxation is a preeminent and indispensable right, and cannot be so aliened by a mere statute or by any grant (other than a treaty or compact between sovereigns) as to prevent its resumption, by the legislature, whenever the public necessities require. And the legislature is the judge of public necessity in such cases. The West River Bridge Company v. Dix, 6 How. 507; Mills v. St. Clair County, 8 How. 584, 585; Butler v. The State of Pennsylvania, 10 How. 402; The People v. The Mayor of Brooklyn, 4 Comstock, 423; The Providence Bank v. Billings, 4 Peters, 563; Brewster v. Hough, 10 N. Hamp. R. 138; Mack v. Jones, 1 Foster, 393; Russell v. The

Mayor of New York, 2 Denio, 474; Maleverer v. Spinke, 1 Dyer, 36, b; Coates v. The Mayor of New York, 7 Cowen, 585; The Brick Presbyterian Church v. The City of New York, 5 Cow. 538; Vanderbilt v. Adams, 7 Cow. 351, 352. Cases to be examined: The State of New Jersey v. Wilson, 7 Cranch, 164; Armstrong v. The Treasurer of Athens, 16 Peters, 290; Fletcher v. Peck, 6 Cranch, 87; The York and North Midland Railway Co. v. The Queen, 1 Ell. & B. 858.

Mr. Chief Justice TANEY. In this case the judgment of the Supreme Court of the State of Ohio is affirmed. But the majority of the court who give this judgment, do not altogether agree in the principles upon which it ought to be maintained. I proceed, therefore, to state my own opinion, in which I am authorized to say my brother Grier entirely concurs.

In 1851, the Legislature of Ohio passed an act "to tax banks and bank and other stocks, the same as other property." The act makes it the duty of the president and cashier of every banking institution having the right to issue bills or notes for circulation annually to list and return to the assessor in the township or ward where the bank is located, the amount of capital and stock at its true value in money, together with the amount of surplus and contingent fund belonging to such institution, upon which the same amount of tax is to be levied and paid as upon the property of individuals. And by the third section of this act the Ohio Life Insurance and Trust Company (the plaintiff in error) was brought within its provisions, and subjected to the payment of a like tax in all the several counties where its capital stock was loaned, according to the amount loaned and the average rate of taxation in each.

The payment of this tax was resisted by the plaintiff in error, upon the ground that the law imposing it impaired the obligation of certain contracts previously made between the State and the corporation.

On the other hand, it was insisted on behalf of the State that the right of taxation cannot be so aliened by mere statute as to prevent its resumption by the legislature whenever the public necessities require; and that the legislature was the judge of the public necessity in such cases.

And further, if it should be held that the Legislature of Ohio had the power to aliene its right of taxation, yet it had not exercised it in this instance; and when the tax in question was levied, there was no previous contract between the State and the corporation by which the State had relinquished the right to impose it.

The company having refused to pay the tax upon the ground

above stated, the defendant in error, who is the treasurer of Hamilton county, in which the corporation is located, instituted proceedings to enforce its collection. And upon final hearing of the parties, the Supreme Court of Ohio decided in favor of the State, and directed the tax to be paid, together with the penalty which the law inflicted for its detention. It is to revise this decree of the State court that the present writ of error is brought.

This brief statement will show that the questions which arise on this record are very grave ones. They are the more important, because, from the multitude of corporations chartered in the different States, and the privileges and exemptions granted to them, questions of a like character are continually arising, and ultimately brought here for final decision. These controversies between a State and its own corporations necessarily embarrass the legislation of the State; and are injurious to the individuals who have an interest in the company. And as the principles upon which this case is decided, will, for the most part, equally apply to all of them, it is proper that they should be clearly and distinctly stated. I proceed to express my own opinion on the subject.

It will be admitted on all hands, that with the exception of the powers surrendered by the Constitution of the United States, the people of the several States are absolutely and unconditionally sovereign within their respective territories. It follows that they may impose what taxes they think proper upon persons or things within their dominion, and may apportion them according to their discretion and judgment. They may, if they deem it advisable to do so, exempt certain descriptions of property from taxation, and lay the burden of supporting the government elsewhere. And they may do this in the ordinary forms of legislation or by contract, as may seem best to the people of the State. There is nothing in the Constitution of the United States to forbid it, nor any authority given to this court to question the right of a State to bind itself by such contracts, whenever it may think proper to make them.

There are, undoubtedly, fixed and immutable principles of justice, sound policy, and public duty, which no State can disregard without serious injury to the community, and to the individual citizens who compose it. And contracts are sometimes incautiously made by States as well as individuals; and franchises, immunities, and exemptions from public burdens improvidently granted. But whether such contracts should be made or not, is exclusively for the consideration of the State. It is the exercise of an undoubted power of sovereignty which has not been surrendered by the adoption of the Constitution of the

United States, and over which this court has no control. For it can never be maintained in any tribunal in this country, that the people of a State, in the exercise of the powers of sovereignty, can be restrained within narrower limits than those fixed by the Constitution of the United States, upon the ground that they may make contracts ruinous or injurious to themselves. The principle that they are the best judges of what is for their own interest, is the foundation of our political institutions.

It is equally clear, upon the same principle, that the people of a State may, by the form of government they adopt, confer on their public servants and representatives all the powers and rights of sovereignty which they themselves possess; or may restrict them within such limits as may be deemed best and safest for the public interest. They may confer on them the power to charter banks or other companies, and to exempt the property vested in them from taxation by the State for a limited time during the continuance of their charters, or accept a specified amount less than its fair share of the public burdens. This power may be indiscreetly and injudiciously exercised. Banks and other companies may be exempted, by contract, from their equal share of the taxes, under the belief that the corporation will prove to be a public benefit. Experience may prove that it is a public injury. Yet, if the contract was within the scope of the authority conferred by the constitution of the State, it is like any other contract made by competent authority, binding upon the parties. Nor can the people or their representatives, by any act of theirs afterwards, impair its obligation. When the contract is made, the Constitution of the United States acts upon it, and declares that it shall not be impaired, and makes it the duty of this court to carry it into execution. That duty must be performed.

This doctrine was recognized in the case of Billings *v.* The Providence Bank, and again in the case of the Charles River Bridge Company. In both of these cases the court, in the clearest terms, recognized the power of a State legislature to bind the State by contract; and the cases were decided against the corporations, because, according to the rule of construction in such cases, the privilege or exemption claimed had not been granted. But the power to make the contract was not questioned. And I am not aware of any decision in this court calling into question any of the principles maintained in either of these two leading cases. On the contrary, they have since, in the case of Gordon *v.* Appeal Tax Court, 3 Howard, 133, been directly reaffirmed.

The question in that case was precisely the same with the present one; that is to say — whether the State had relinquished

its right of taxation to a certain extent, in its charter to a bank? The court held that it had, and reversed the judgment of the State court, which had decided to the contrary. And this opinion appears to have been unanimous — for no dissent is entered.

Again, in the case of the Richmond Railroad Company v. The Louisa Railroad Company, 13 Howard, 71 — the question was, whether the State had not, by its charter to the former, contracted not to authorize a road like the latter, which would tend to diminish the number of passengers travelling upon the former between Richmond and Washington. The case therefore in principle was the same with that of the Charles River Bridge v. The Warren Bridge; and it was decided on the same ground : that is — that the contract, according to the rule of construction laid down in the Charles River Bridge case, did not extend to such a road as was authorized by the charter to the Louisa Railroad Company. But the opinion of the majority of the court is founded expressly upon the assumption that the legislature might bind the State by such a contract; and the three judges who dissented were of opinion not only that the legislature might bind it, but that it had bound it; and that the charter to the Louisa Railroad Company violated the contract and impaired its obligation. They adopted a rule of construction more favorable to the corporation than the one sanctioned in the Charles River Bridge v. The Warren Bridge.

It seemed proper on this occasion to remark more particularly upon this case, and the case of Gordon v. The Appeal Tax Court, because the last mentioned case was a restriction upon the taxing power of the State; and the other a restriction upon its power to authorize useful internal improvements — the two together illustrating and confirming the principles upon which the Providence Bank v. Billings, and the Charles River Bridge case, were decided.

There are other cases upon the same subject, but it is not necessary to extend this opinion by referring to them. It is sufficient to say, that they will all be found to maintain the same principles with the cases above mentioned, and that there is no one case in which this court has sanctioned a contrary doctrine.

I have dwelt upon this point more at length, because, while I concur in affirming the judgment of the Supreme Court of the State of Ohio, I desire that the grounds upon which I give that opinion should not be misunderstood; for I dissent most decidedly, as will appear by this opinion, from many of the doctrines contained in the opinions of some of my brethren, who concur with me in affirming this judgment. I speak of the opinions they have expressed in the case of the Piqua Bank, as well as in this.

The powers of sovereignty confided to the legislative body of a State are undoubtedly a trust committed to them, to be executed to the best of their judgment for the public good; and no one legislature can, by its own act, disarm their successors of any of the powers or rights of sovereignty confided by the people to the legislative body, unless they are authorized to do so by the constitution under which they are elected.  They cannot, therefore, by contract, deprive a future legislature of the power of imposing any tax it may deem necessary for the public service — or of exercising any other act of sovereignty confided to the legislative body, unless the power to make such a contract is conferred upon them by the constitution of the State.  And in every controversy on this subject, the question must depend on the constitution of the State, and the extent of the power thereby conferred on the legislative body.

This brings me to the question more immediately before the court : Did the constitution of Ohio authorize its legislature, by contract, to exempt this company from its equal share of the public burdens during the continuance of its charter ?  The Supreme Court of Ohio, in the case before us, has decided that it did not.  But this charter was granted while the constitution of 1802 was in force ; and it is evident that this decision is in conflict with the uniform construction of that constitution during the whole period of its existence.  It appears, from the acts of the legislature, that the power was repeatedly exercised while that constitution was in force, and acquiesced in by the people of the State.  I was directly and distinctly sanctioned by the Supreme Court of the State in the case of the State v. The Commercial Bank of Cincinnati, 7 Ohio Rep. 125.

And when the constitution of a State, for nearly half a century, has received one uniform and unquestioned construction by all the departments of the government, legislative, executive, and judicial, I think it must be regarded as the true one.  It is true that this court always follows the decision of the State courts in the construction of their own constitution and laws. But where those decisions are in conflict, this court must determine between them.  And certainly a construction acted on as undisputed for nearly fifty years by every department of the government, and supported by judicial decision, ought to be regarded as sufficient to give to the instrument a fixed and definite meaning.  Contracts with the State authorities were made under it.  And upon a question as to the validity of such a contract, the court, upon the soundest principles of justice, is bound to adopt the construction it received from the State authorities at the time the contract was made.

It was upon this ground, that the court sustained contracts

made in good faith in the State of Mississippi, under an existing construction of its constitution, although a subsequent and contrary construction given by the courts of the State, would have made such contracts illegal and void. The point arose in the case of Rowan and others *v*. Runnels, 5 How. 134. And the court then said, that it would always feel itself bound to respect the decisions of the State courts, and, from time to time as they were made, would regard them as conclusive in all cases upon the construction of their own constitution and laws ; but that it ought not to give them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other States, which in the judgment of this court were lawful at the time they were made. It is true, the language of the court is confined to contracts with citizens of other States, because it was a case of that description which was then before it. But the principle applies with equal force to all contracts which come within its jurisdiction.

Indeed, the duty imposed upon this court to enforce contracts honestly and legally made, would be vain and nugatory, if we were bound to follow those changes in judicial decisions which the lapse of time, and the change in judicial officers, will often produce. The writ of error to a State court would be no protection to a contract, if we were bound to follow the judgment which the State court had given, and which the writ of error brings up for revision here. And the sound and true rule is, that if the contract when made was valid by the laws of the State, as then expounded by all the departments of its government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the State, or decision of its courts, altering the construction of the law.

It remains to inquire whether the act of 1851 impaired the obligation of any existing contract or contracts with the plaintiff in error.

Before, however, I speak more particularly of the acts of the Legislature of Ohio, which the company rely on as contracts, it is proper to state the principles upon which acts of that description are always expounded by this court.

It has been contended, on behalf of the defendant in error, (the treasurer of the State,) that the construction given to these acts of assembly by the State courts ought to be regarded as conclusive. It is said that they are laws of the State, and that this court always follows the construction given by the State courts to their own constitution and laws.

But this rule of interpretation is confined to ordinary acts of legislation, and does not extend to the contracts of the State,

although they should be made in the form of a law. For it would be impossible for this court to exercise any appellate power in a case of this kind, unless it was at liberty to interpret for itself the instrument relied on as the contract between the parties. It must necessarily decide whether the words used are words of contract, and what is their true meaning, before it can determine whether the obligation the instrument created has or has not been impaired by the law complained of. And in forming its judgment upon this subject, it can make no difference whether the instrument claimed to be a contract is in the form of a law passed by the legislature, or of a covenant or agreement by one of its agents acting under the authority of the State.

It is very true that, if there was any controversy about the construction and meaning of the act of 1851, this court would adopt the construction given by the State court. And if that construction did not impair the obligation of the contract as interpreted by this court, there would be no ground for interfering with the judgment. For then the contract, as expounded here, would not be impaired by the State law. But if we were bound to follow not only the interpretation given to the law, but also to the instrument claimed to be a contract, and alleged to be violated, there would be nothing left for the judgment and decision of this court. There would be nothing open which a writ of error or appeal could bring here for consideration and judgment; and the duty imposed upon this court under this clause of the Constitution would, in effect, be abandoned.

I proceed, therefore, to examine whether there is any contract in the acts of the legislature relied on by the plaintiff in error, which deprives the State of the power of levying upon the stock and property of the company its equal share of the taxes deemed necessary for the support of the government.

The company was chartered by the Legislature of Ohio on the 12th of February, 1834.

The purposes for which it was incorporated, and the character of the business it was authorized to transact, are defined in the 2d section. It confers upon the company the power — 1. To make insurance on lives. 2. To grant and purchase annuities. 3. To make any other contracts involving the interest or use of money and the duration of life. 4. To receive money in trust, and to accumulate the same at such rate of interest as may be obtained or agreed on, or to allow such interest thereon as may be agreed on. 5. To accept and execute all such trusts of every description as may be committed to them by any person or persons whatsoever, or may be transferred to them by order of any court of record whatever. 6. To receive and hold lands under

grants with general or special covenants, so far as may be necessary for the transaction of their business, or where the same may be taken in payment of their debts, or purchased upon sales made under any law of the State, so far as the same may be necessary to protect the rights of said company, and the same again to sell, convey, and dispose of. 7. To buy and sell drafts and bills of exchange.

In addition to these powers, it was authorized by the 23d section of the charter to issue bills or notes until the year 1843 —subject to certain restrictions and limitations therein specified.

And the 25th section provides that no higher taxes shall be levied on the capital stock or dividends of the company, than are or may be levied on the capital stock or dividends of incorporated banking institutions in the State.

The last section of the charter reserved the right to the State to repeal, amend, or alter it after the year 1870.

These are the only provisions material to the question before us.

At the time this charter was granted the act of March 31, 1831, was in force, which imposed a tax of five per cent. on the dividends declared by any banks, insurance, or bridge companies.

Subsequently, on the 14th of March, 1836, after this company was incorporated, another law was passed to prohibit the circulation of small bills; and by this law a tax of twenty per cent. was imposed upon dividends, with a proviso, "That should any bank, prior to the 4th of July next following, with the consent of its stockholders, by an instrument of writing under its corporate seal, addressed to the auditor of the State, surrender the right conferred by its charter to issue or circulate notes or bills of a less denomination than three dollars, after the 4th of July, 1836; and any notes or bills of a less denomination than five dollars after the 4th of July, 1837; then the auditor of the State should be authorized to draw on such banks only for the amount of five per cent. upon its dividends declared after the surrender.

As the plaintiff in error had the usual banking power of issuing notes and bills for circulation until 1843, it justly considered itself within the provisions of this law, and filed the surrender required; and ever since, until 1851, has paid the tax of five per cent., and no more, upon the dividends it declared. The act of 1836 was repealed in 1838, and permission again given to the banks to issue small notes and bills; but it does not appear that the Life Insurance and Trust Company ever availed itself of the privilege. Afterwards, in 1845, another law was passed incorporating the State Bank of Ohio, and such banking com-

panies as might afterwards organize themselves under and according to the provisions of that act. And the 60th section of this law provided that each banking company organized under that act should pay, semiannually, six per cent. on its profits, which should be in lieu of all taxes to which such companies, or the stockholders thereof, on account of stocks owned therein, would otherwise be subject.

Upon these acts of assembly the plaintiff in error defends itself against the tax imposed by the act of 1851, upon two grounds:

1. That by the act of 1836 the State agreed to relinquish the right to impose a higher tax than five per cent. upon the dividends declared by the corporation, during the continuance of its charter, upon the surrender of its right to issue small bills or notes.

2. That if this proposition is decided against it, yet, as the act of 1845 established a general banking system, by which the State agreed to receive from each bank organized under it, six per cent. upon its profits, in lieu of all taxes to which it would otherwise be subject, the State could not impose a higher tax upon this company under the contract contained in the 25th section of its charter hereinbefore mentioned.

The rule of construction, in cases of this kind, has been well settled by this court. The grant of privileges and exemptions to a corporation are strictly construed against the corporation, and in favor of the public. Nothing passes but what is granted in clear and explicit terms. And neither the right of taxation nor any other power of sovereignty which the community have an interest in preserving, undiminished, will be held by the court to be surrendered, unless the intention to surrender is manifested by words too plain to be mistaken. This is the rule laid down in the case of Billings *v.* The Providence Bank, and reaffirmed in the case of the Charles River Bridge Company.

Nor does the rule rest merely on the authority of adjudged cases. It is founded in principles of justice, and necessary for the safety and well-being of every State in the Union. For it is a matter of public history, which this court cannot refuse to notice, that almost every bill for the incorporation of banking companies, insurance and trust companies, railroad companies, or other corporations, is drawn originally by the parties who are personally interested in obtaining the charter; and that they are often passed by the legislature in the last days of its session, when, from the nature of our political institutions, the business is unavoidably transacted in a hurried manner, and it is impossible that every member can deliberately examine every provison in every bill upon which he is called on to act.

On the other hand, those who accept the charter have abundant time to examine and consider its provisions, before they invest their money. And if they mean to claim under it any peculiar privileges, or any exemption from the burden of taxation, it is their duty to see that the right or exemption they intend to claim is granted in clear and unambiguous language. The authority which this court is bound under the Constitution of the United States to exercise, in cases of this kind, is one of its most delicate and important duties. And if individuals choose to accept a charter in which the words used are susceptible of different meanings — or might have been considered by the representatives of the State as words of legislation only, and subject to future revision and repeal, and not as words of contract — the parties who accept it have no just right to call upon this court to exercise its high power over a State upon doubtful or ambiguous words, nor upon any supposed equitable construction, or inferences made from other provisions in the act of incorporation. If there are equitable considerations in their favor, the application should be made to the State and not to this court. If they come here to claim an exemption from their equal share of the public burdens, or any peculiar exemption or privilege, they must show their title to it — and that title must be shown by plain and unequivocal language.

Applying this rule of construction to the laws hereinbefore referred to, it is evident that the first ground of defence cannot be maintained.

When the act of 1836 was passed the State had an undoubted right, if it deemed proper, to impose the tax of twenty per cent. upon the incorporated companies therein mentioned, and to include the Life Insurance and Trust Company among them. Indeed the right of the State in this respect is not disputed, and the argument on behalf of the plaintiff in error upon this point necessarily admits it. And we see nothing in the proviso which can fairly be construed as a contract on the part of the State that it would not afterwards change the policy which that law was intended to carry into operation ; nor any thing like a pledge that the State would not thereafter impose a tax of more than five per cent. upon the dividends of such banks as complied with the specified condition. The law is not a proposition addressed to the banks, but an ordinary act of legislation addressed to its own officer, and prescribing his duty in levying and collecting taxes from the corporations it mentions. It was the policy of the State, at that time. to infuse more gold and silver in the circulating currency, and to put an end to the circulation of small notes. The act of 1836 was manifestly intended to accomplish that object And the tax is accordingly so regulated as to make

it the interest of the banks to abstain from issuing them. But the insolvency of the Bank of the United States, and many of the State banks, and the general stoppage of specie payments, which happened soon afterwards, made it impossible to carry out the policy which the State deemed best for the public interests. The prohibition to issue small notes was therefore repealed in 1838, and the privilege of issuing them again restored to the banks. Now, without resorting to the established rule of construction, above stated, no fair interpretation of the words of these laws can make them other than ordinary acts of legislation, which the State might modify or change according to the necessities of the public service. It would be straining the words beyond their just import and meaning to construe the reduced taxes levied, while the banks were prohibited from issuing small notes, as a perpetual contract not to levy more, although the privilege for which the reduction was intended, as an equitable compensation, should be restored. If it could be regarded as a contract, it evidently meant nothing more than that the tax should not be raised while the banks were prohibited from issuing small notes.

But the subject-matter of these laws shows that no contract could have been intended. Every contract of this kind presupposes that some consideration is given, or supposed to be given, by the corporation — that the community is to receive from it some public benefit, which it could not obtain without the aid of the company. But in this instance the consent or coöperation of this company was not necessary to enable the State to carry out the policy indicated by the act of 1836. It had indeed at that time the power to issue notes and bills for circulation. But the grant of this right to the corporation, in general terms, was not a surrender of the right of the State to prescribe by law, the lowest denomination for which notes or bills should be allowed to circulate. No such surrender is expressed, and none such therefore can be implied or presumed. For it is not only the right, but the duty of the State to secure to its citizens, as far as it is able, a safe and sound currency, and to prevent the circulation of small notes when they become depreciated, and are a public evil. And the community have as deep an interest in preserving this right undiminished, as they have in the taxing power. And like the taxing power it will not be construed to be relinquished, unless the intention to do so is clearly expressed. The general power to issue notes and bills, without any express grant as to small notes, is subordinate to the power of the State to regulate the amount for which they may be issued.

Moreover, the power of the Life Insurance and Trust Company to issue notes or bills, of any description, terminated by the

express provision in its charter in 1843.　And if the acceptance of the condition contained in the proviso in the act of 1836 made that law a contract on the part of the State, the reduced tax was the consideration for the surrender of the privilege.　It surrendered the privilege until 1843.　It had nothing to surrender after that time.　And of course there was nothing for which the State was to give an equivalent, or for which the company had even an equitable claim to require compensation.　It would be a most unreasonable construction of such an agreement to say, that in consideration that the company would abstain from embarrassing the community with a small note circulation for seven years, the State contracted not only to exempt it from its equal share of taxation during the time it abstained, but also for twenty-seven years afterwards, during which period the corporation would be exercising every privilege originally conferred on it by its charter, and giving no equivalent for the exemption. Before such a conclusion can be arrived at, the rule hereinbefore stated must be reversed, and every intendment made in favor of the exclusive privileges of the corporation, and against the community ; and that intendment, too, must be pushed beyond the fair and just construction of the language used, or the subject-matter and object of the agreement.

In every view of the subject, therefore, the defence taken under the act of 1836 cannot be maintained.

The second proposition of the plaintiff in error is equally untenable.

The contract with this company in relation to taxation is contained in the 25th section of the charter hereinbefore set forth.　Its obvious meaning is, that the tax upon this company should be regulated by the taxes which the policy or the wants of the State might induce it to impose by its general laws upon banking institutions.　And in the legislation of Ohio, the words " banking institutions " or " banks " appear always to be confined to corporations which were authorized to issue bills or notes for circulation as currency.　This company, therefore, was to be subject to the taxes then levied, or which its policy or necessities might afterwards induce it to levy, on banking institutions.　The tax is not to be regulated by any special contract that the State had made, or might afterwards make, with a particular bank or banks.　Nor is there any pledge on the part of the State that it will not afterwards enter into such contracts, and reserve in them a higher or lower rate of interest than that prescribed by its general laws.　There is no provision in relation to such contracts contained in its charter.　Its taxes are to be raised or lessened as the legislature may from time to time prescribe in cases of banks where no special contract in-

tervenes to forbid it. This, in my opinion, is the true interpretation of the words used.

At the time the charter was granted, the act of March 12, 1831, was in force, which imposed a tax of five per cent. on the dividends of banks, insurance, and bridge companies. Of course, the plaintiffs in error were subject to that tax, and no more, while the law of 1831 continued in force ; and it was not affected by any special contracts which the State had previously made. And it would have been liable to the tax of twenty per cent. imposed by the general act of 1836, if it had not complied with the condition in the proviso. But having complied, it remained, like other banking institutions which had no special contract, subject to the tax of five per cent.

Then came the act of 1845, which incorporated the State Bank, and authorized individuals to form banking companies in the manner and upon the terms therein specified. The 60th section provided that the banking companies organized under it should each pay, semiannually, six per cent. on its profits, which sum should be in lieu of all taxes to which the company or stockholders would otherwise be subject. It will be observed that this provision does not extend to all the banks in the State, but is, in express terms, confined to those which should be organized under that act of assembly ; that is to say, to such banks only as should be organized in the manner authorized by that law, and become liable to all the restrictions, provisions, and duties prescribed in it.

The court has already decided at the present term that the State has, by this section, relinquished the right to impose a higher tax than the one therein mentioned, upon any bank organized under that law. But that decision does not affect this case. For this company was not organized under the act of 1845, and is not therefore embraced by the 60th section. It remained under the regulation of the general law, and was still subject to a tax of five per cent. on its dividends, and nothing more. It was not liable to the increased tax of six per cent. upon profits levied upon these banks. For that tax was the result of a special agreement, and not of the repeal of former laws. And so it appears to have been understood and construed by the parties interested. The plaintiff in error continued to pay five per cent. on its dividends; while the banks organized under the act of 1845, paid the increased tax of six per cent. on their profits. Neither was the duration of its charter shortened. It still was to continue until 1870, while the corporate existence of these banks was to terminate in 1866. Nor was it subject to the restrictions, limitations, or duties imposed upon them, when they differed from those of its own charter.

This being the case, there is no reason why the tax to be paid by the plaintiff in error should not be regulated by the general rule prescribed by the act of 1851. It was regulated by the general act of 1836, until this law was passed. Its tax was then lower than that levied on the banking companies organized under the act of 1845. And, as the special contract on which these banks were chartered did not apply to this corporation before the act of 1851, we do not see upon what ground it can be applied afterwards. As the tax levied on the .·'fe Insurance and Trust Company was regulated by the general rule before, it would seem to follow that it should continue to be so regulated, as there is nothing in that law to alter its original charter. The increased amount of the tax can make no difference.

It is said, however, that when the act of 1851 was passed, there was no solvent bank in the State except those brought into existence by the act of 1845; that those previously established had all failed, and consequently there was no banking institution upon which the increased tax could operate. There is some difference, as to this fact, between the counsel. But I do not deem it material to institute a particular inquiry upon the subject. The provisions of the act of 1851 are general, and expressly apply to all banks then in existence, if any, or which have since been established, unless they were exempted from its operation by contract with the State. And it is by this general rule or policy that this company is bound by its charter to abide.

Besides, it has been stated in the argument, and seems to have been admitted, that in 1845 there was no banking institution in the State upon which a tax was levied. They had all, it is said, stopped payment and made no dividends, and consequently no tax was paid. And this fact was strongly urged in the case of the Piqua Branch of the State Bank of Ohio against Jacob Knoop, Treasurer, in order to support the construction of the contract which has been sanctioned by the court. Yet the fact that there was no bank then in existence paying the tax, did not withdraw the Life Insurance and Trust Company from the operation of the general law, nor subject it to the increased taxation of the act of 1845.

Again it is said, that forty or fifty banks were organized under the act of 1845, and that that act formed the general banking system of the State; and the rule of taxation then prescribed ought, therefore, to be applied to this corporation, under the terms of its charter. But, as I have already said, the charter to the Life Insurance and Trust Company does not prohibit the State from granting charters, under any special limitation as to

taxation, which it may deem advisable and for the public interest. And if it may grant one, it may grant as many as it may suppose the public interest requires, upon the same or upon different conditions from each other. The State has not contracted that this company shall have the benefit of all or any of such agreements, or shall pay only the lowest tax levied on a bank, or the tax levied on the greater number of them. It has agreed that it shall have the benefit of its general regulations and laws in this respect, but not of its special contracts. And when the owners of property, vested in the stocks of a corporation, come here to claim a privilege or franchise, which exempts them from their equal share of the public burdens borne by the rest of the community, they are entitled to receive what is expressly or plainly granted to them, and nothing more.

Upon the whole, I am of opinion that the act of 1851 does not impair the obligation of any contract with the plaintiff in error, and the judgment of the Supreme Court of Ohio ought therefore to be affirmed.

Mr. Justice CATRON.

I stated my views as to the character and effect of the sixtieth section of the act of 1845, in the case of The Piqua Bank *v.* Knoop; there I came to the conclusion that no restraint was intended to be imposed on a future legislature to impose different and additional taxes on the banks to which the act applies; if that was deemed necessary for the public welfare.

2d. My conclusion, also, was in the above case, that if such restraint had been attempted, it was inoperative for want of authority in a legislature to vest in a corporation by contract, to be held as a franchise and as corporate property, a general political power of legislation, so that it could not be resumed and exercised by each future legislature. That a different doctrine would tend to sap and eventually might destroy the State constitutions and governments; as every grant of the kind, to corporations or individuals would expunge so much of the legislative power from the State constitution as the contract embraced; and if the same process was applied to objects of taxation, first one and then another might be exempted, until all were covered, and subject to the same immunity, when the government must cease to exist for want of revenue.

3d. That the constitution of Ohio, of 1802, forbid such tying up of the hands of future legislatures acting under its authority, it being so construed by her own courts, whose decisions we were bound to follow. Nor has any law or decision of a court in Ohio construed its late constitution of 1802 in this regard, until the decisions, lately made on the tax laws here in controversy, settled its true meaning.

These principles will equally apply in this case as they did in that of The Piqua Bank v. Knoop; even admitting that the sixtieth section of the act of 1845 is in effect and fact a general provision applicable to the existing banks of Ohio, and embraces the Insurance and Trust Company.

It is proper that I should say, my object here is not to express an opinion in this case further than to guard myself against being committed in any degree to the doctrine that the sovereign political power is the subject-matter of a private contract that cannot be impaired or altered by a subsequent legislature; that such act of incorporation is superior to subsequent State laws affecting the corporators injuriously; and that the corporation holds its granted franchises under the Constitution of the United States, in effect, and holds and maintains the portion of sovereign power vested in it by force of the authority of this court: thus standing off from and above the local State authorities, political and judicial, and setting them at defiance, as has been most signally done in one instance, brought to our consideration from Ohio at this term, in the case of Deshler v. Dodge. There the tax collector distrained nearly forty thousand dollars' worth of property from four of these banks claiming exemption. On the same day an assignment was made by the four banks of the property in the collector's hands to Deshler, a citizen of New York. He sued out a writ of replevin in the Circuit Court of the United States, founded on these assignments. The marshal of that court, by its process, retook the property from the tax-collector's hands, and delivered it to the non-resident assignee, as the legal and true owner, who now holds it.

No other or further step is required to secure our protection to corporations setting up claims to exemption from State laws. I have become entirely convinced that the protection of State legislation and independence, supposed to be found in a liberal construction of State laws in favor of the public and against monopolies, as asserted in the Charles River Bridge case, is illusory and nearly useless, as almost any beneficial privilege, property, or exemption, claimed by corporations or individuals in virtue of State laws, may be construed into a contract, presenting itself as unambiguous and manifestly plain to one mind, whereas to another it may seem obscure, and not amounting to a contract. No better example can be found than is here furnished.

When I take into consideration this fact, and, in connection with it, the unparalleled increase of corporations throughout the Union within the last few years; the ease with which charters, containing exclusive privileges and exemptions are obtained; the vast amount of property, power, and exclusive benefits, prejudicial to other classes of society that are vested in and held

by these numerous bodies of associated wealth, I cannot but feel the grave importance of being called on to sanction the conclusion that they hold their rights of franchise and property under the Constitution of the United States, and practically under this court, and stand above the State government creating them.

My opinion is, that the judgment of the State court should be affirmed for the reasons here suggested, and stated by me at large in the case of the Piqua Bank v. Knoop.

Mr. Justice DANIEL.

In the conclusion adopted by the opinion of the court, that the judgment of the Supreme Court of Ohio should be affirmed, I entirely concur, but from the reasoning by which the court has reached its conclusion I am constrained to dissent. I never can believe in that, to my mind suicidal doctrine, which confers upon one legislature, the creatures and limited agents of the sovereign people, the power, by a breach of duty and by transcending the commission with which they are clothed, to bind forever and irrevocably their creator, for whose benefit and by whose authority alone they are delegated to act, to consequences however mischievous or destructive. The argument of the court in this case leading, in my apprehension, to the justification of abuses like those just referred to, I must repudiate that argument, whilst I concur in the conclusion that the decision of the Supreme Court of the State of Ohio should be affirmed, both for the reasons assigned in support of their judgment by that court, and for the further reason that this court cannot rightfully take cognizance of the parties to this controversy.

Mr. Justice CAMPBELL.

My opinion is, that the act of the general assembly of Ohio, entitled "An act to tax banks, and bank and other stocks, the same as other property is now taxable by the laws of this State, of March, 1851," does not impair the obligation of any contract contained in the act of incorporation of the plaintiff, or in any other act of the general assembly of the State with which the plaintiff is concerned.

I concur in the opinion of the chief justice concerning the interpretation of the statutes of Ohio involved in this case, and the doctrines of interpretation applicable to these and statutes of a similar description, and in the conclusions to which tl conduct.

In the decision of the cases which have been brought to this court from the Supreme Court of Ohio, I have not found it necessary to declare an opinion upon the powers of the general

assembly to modify or to repeal an act of incorporation like the one held by these banking institutions; nor of the limitations upon the general assembly in administering the power of taxation — much less to consider the powers of the people of Ohio, to reform all the proceedings and acts of their government, or whether those powers of the people can be controlled in their exercise by any jurisdiction or authority lodged in this court.

The questions pressing upon us involve interests of such a magnitude, and consequences so important, that I feel constrained to stop at the precise limit at which I find myself unable to decide the case at law or equity before me — that being the limit of my constitutional power and duty.

I file this opinion merely to say, that I do not concur in the opinion which has been delivered on the points wherein any of these questions are directly or indirectly considered.

Mr. Justice McLEAN.

The language of the 25th section of the charter of the Ohio Life Insurance and Trust Company, is, " No higher taxes shall be levied on the capital stock or dividends of the company than are or may be levied on the capital stock or dividends of incorporated banking institutions in this State."

This charter was passed the 12th of February, 1834. It was accepted by the company, a large amount of stock was subscribed and paid, and the bank was organized and went into operation.

The 2d section gave power to the company, 1. To make insurances on lives. 2. To grant and purchase annuities. 3. To make any other contracts involving the interest or use of money, and the duration of life. 4. To receive money in trust, and to accumulate the same at such a rate of interest as may be obtained or agreed on, or to allow such interest thereon as may be agreed on. 5. To accept and execute all such trusts of every description, as may be committed to them by any person or persons whatsoever, or may be transferred to them by order of any court of record whatever. 6. To receive and hold lands under grants, with general or special covenants, so far as the same may be necessary for the transaction of their business, or where the same may be taken in payment of their debts, or purchased upon sales made under any law of this State, so far as the same may be necessary to protect the rights of the said company, and the same again to sell, convey, and dispose of. 7. To buy and sell drafts and bills of exchange.

The capital stock of the corporation was fixed at two millions of dollars, the whole of which was required to be invested in bonds or notes drawing interest, not exceeding seven per

cent. per annum, secured by unencumbered real estate within the State of Ohio, of at least double the value in each case, of the sum so secured.

By the 23d section it is declared that, "the company shall have power until the year 1843, to issue bills or notes to an amount not exceeding twice the amount of the funds deposited with said company, for a time not less than one year, other than capital; but shall not, at any time, have in circulation an amount greater than one half the capital actually paid in and invested in bonds or notes secured by an unencumbered real estate, agreeably to the 7th section of this act, nor a greater amount than twice the amount of deposits, &c.

The section under which the claim to a limited taxation is maintained, is only made certain by reference to the taxes levied on the capital stock or dividends of other incorporated banking institutions. And more satisfactorily to arrive at this result, it may be proper to see what construction has been given to the section by the officers of State, whose duty it was to assess the tax and collect it.

The act of the 12th of March, 1831, imposed a tax on banks of five per cent. upon the amount of their dividends. This tax was paid by the Trust Company until the act of the 14th of March, 1836, called the act to prohibit the circulation of small bills. Under this act the auditor was authorized to draw in favor of the Treasurer of State for twenty per cent. on the dividends of the banks, provided, if they should agree in the form required to relinquish the right under their charters to issue five dollar bills, and three dollars, the auditor should draw only for five per cent.

The Trust Company acceded to the proposal, and filed the necessary papers relinquishing the right to issue the small bills as required. But this made no difference in the amount of the tax paid by the bank.

The tax continued the same rate of rate per cent. on the dividends of banks until the act of 1845 was passed, containing the following compact: "Each banking company, organized under this act, or accepting thereof, and complying with its provisions, shall semiannually, on the days designated in the fifty-ninth section, set off to the State six per cent. on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding; which sum or amount, so set off, shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject," &c.

As the power of the State to exempt property from taxation, under a compact which binds it, has been discussed somewhat

at large in the case of the Piqua Branch Bank *v.* Knoop, at this term, nothing farther need now be said on the subjects there examined; but the point, whether there is a contract which should exempt the Trust Company Bank from general taxation, must be considered. There are two grounds under which this bank claims an exemption.

1. Under its original charter.

2. Under the small note act of 1836. The second I shall not consider.

The twenty-fifth section in the charter guarantees that "no higher taxes shall be levied on the Trust Company than on the capital or dividends of incorporated banking institutions in the State." Now, to make this provision specific as to the amount of the tax, the other banking institutions of the State to which the section refers, must be ascertained.

Some doubt may arise, whether the institutions referred to were such as were existing at the time the charter was granted, or to banks subsequently taxed. As the words in the section, in relation to taxation of the bank, are, "than are or may be levied," it would seem to embrace the future law of taxation, as well as the one in force at the date of the charter. Taking this as the true construction, the tax of five per cent. on the dividends was properly assessed under the act of 1831 and 1836.

At the time the charter of this company went into operation, some of the banks were taxed four per cent. on their dividends; but as the greater number were taxed five per cent. on their dividends, the Auditor of State drew for five. This seemed to be a reasonable construction of the twenty-fifth section, as it refers to a general rule of taxation, and not to a particular one. The tax shall not be higher than that on the incorporated banks of the State.

After the act of 1845, the Trust Company was chargeable with six per cent. on the dividends, deducting expenses and ascertained losses, on the ground that a very large proportion of the banks of the State were so taxed; and that would seem to come within the intention of the Trust Company charter. Without doing violence to the language of the twenty-fifth section, it cannot be said to embrace the highest rate of taxation nor the lowest; that rate which would include the greater number of banks, would seem to be just. And that was the construction given by the auditor before the tax law of 1851.

The act of the 12th of March, 1851, imposed a much higher tax on banks, by assessing it on all the property of the banks, instead of the six per cent. on the dividends. This embraced the banks chartered under the act of 1845, as well as all others. And if this law had been held to be constitutional, it would, undoubtedly, apply to the Trust Company.

On the 21st of March, 1851, the same day the above tax law was passed, an act to authorize free banking was enacted, which continued in force until it was repealed by the adoption of the constitution.   Under this law it is ascertained, from the report of the auditor, that thirteen banks, or about that number, were organized.   There were about fifty banks organized under the act of 1845.   Four of the old banks were not included in this organization.   Now, all the banks organized under the act of 1845, as we have held in the Piqua Branch Bank case, were not subject to a higher tax than six per cent. on their dividends.

At the time the tax law of 1851 was made to operate on the Trust Company, there does not appear to have been a bank in the State on which such tax could be assessed.   There were, it is believed from the report of the Auditor of State, thirteen banks organized under the Bank Act of 1851, passed on the same day as the Tax Act; but not one of those banks was in operation until some time after the tax took effect on the Trust Company.   This Bank Act was repealed by the new constitution so as to arrest the further organization of banks under it.   Now, from these facts the question arises, whether the twenty-fifth section shall be held to apply to the fifty banks in operation under the act of 1845, or to the thirteen banks which were afterwards organized under the act of 1851.   It is true that the act of 1851, imposing the tax, was intended to affect all the banks, and especially the Trust Company, but that act being held to be unconstitutional, cannot be considered as governing the twenty-fifth section of the Trust Company charter.   The provision in that section, that " no higher duties shall be levied on the capital stock or dividends of the company than are or may be levied on the capital stock or dividends of incorporated banking institutions in the State," must refer to a legal taxation; and if this be the correct interpretation, then, at the time this tax law was passed, there was not a bank in the State on which the tax could take effect.   The twenty-fifth section referred to incorporated institutions and not to contemplated incorporated banks.   Such a construction must be given to the section, if it have any effect.   This reference, embracing the taxation under the act of 1845, gives to the Trust Company charter the same effect as if the sixtieth section of the act of 1845 had been embodied in it.   By reference it constitutes a part of the Trust Company charter, and it would seem to me that nothing short of this gives to the twenty-fifth section the effect it was intended to have.

That section has been relied on by the bank as a pledge or compact, not complete within itself as to the amount of the tax ; but by reference to existing incorporated banks, embracing

the tax imposed upon them as the tax intended to be applied to the Trust Company.

In this view this section is made certain, and contains all the requisites of a contract.   The same certainty would make good a grant for land.   And this is sufficient.   The restriction of the power of the Legislature of Maryland, in regard to taxing the banks of that State, was made out by construction as clearly and as satisfactorily as if it had been expressed in words.

Would any one contend that the Legislature of Ohio could tax the Trust Company under its charter, without any reference to existing incorporated banks?   This was done by the tax law of 1851.   But the legislature may have supposed that law would operate upon all banks in the State.   As that law cannot so operate, this tax on the Trust Company then should be considered as taxing the Trust Company without reference to any existing banks, but to those which might or might not be organized under the act of 1851.   This, it seems to me, is in violation of all sound rules of construing the twenty-fifth section.

The Supreme Court of the State considered this charter of the Trust Company as resting on the same footing as the other banks.   In the discussion of the subject the sixtieth section of the act of 1845 was examined.   They rightly considered that section as applying, by reference, to that company; and, in this respect, I entirely agree with them. I think the Trust Company stands upon the same basis, and should have the same judgment applied to it, as was applied to the banks under the act of 1845.

In the argument of the counsel against the Trust Company Bank, it was insisted that the rule which is to determine the amount of taxation, is found in the banking companies under the act of 1851, and not under the act of 1845.   And this is founded chiefly on the fact that the act of 1851 was a general law, and imposed a tax upon all the banks of Ohio.   This argument would be unanswerable, if the existing banks were subject to the tax law of 1851.   But, under our decision, that law has no operation on the existing banks; and this fact was not considered by the counsel.   The decision in the Piqua Bank case has taken this ground from the counsel.   For they did not, in any part of their argument, contend that the tax could apply to the Trust Company as " incorporated banks," when no such banks were incorporated.   This would seem to be in violation, not only of the words of the 25th section, but of the clear import of that section.

Neither the supreme court of the State nor the counsel relied upon such an argument.   The court of the State and the counsel in the Trust Company case, discussed the 60th section

of the act of 1845, as by reference, constituting a part of its charter.   And this is the true question in the case.

The privilege of issuing bills of circulation, which terminated in 1843, can have no effect upon the question of taxation.   That company still exercised, under its charter, its banking powers as a bank of deposit, and did a much larger business than any bank of the State.   After 1843, as before that period, its dividends were taxed as the other banks.   It was in fact a bank, and discounted, and was the principal bank in the State.   These facts appear from the taxes paid to the auditor, which constitute a part of the record.

In the argument it is assumed that this bank is taxed at the rate only at which individuals are taxed.   From the facts before us, I think there is a mistake in this statement.

The capital of this bank is stated in the charter to be two millions of dollars.   From the record it appears that eight per cent. is the average dividend declared.   This would give one hundred and sixty thousand dollars, as dividend, per annum. From the report of the auditor of Ohio I observe the taxes charged against the Trust Company, including the penalties incurred for that year, amounts to the sum of $108,477.85. This sum, deducted from the dividends for the year, will leave only the sum of $51,523 to be distributed among the stockholders.   This would give to them little more than two and a half per cent. on their capital.   But if the bank had paid the tax, without incurring any penalty, it would have amounted to a sum not much below seventy thousand dollars.   This would take nearly one half of the profits of the year.   This result must convince any one that there must be some error in the statement, that this bank is taxed no more than property is taxed in the hands of individuals.   No free people would pay nearly one half the profit of a large concern, in taxes.   But I think this result may be accounted for.

The capital of this bank is loaned at seven per cent., and distributed among the counties of the State.   Funds are received on deposits for which four per cent. per annum, or a higher rate of interest is paid.   The bank having the general confidence of business men, its deposits are large, the notes payable to the bank, bills of exchange, &c., are all assessed at their face, as capital, and also, it is supposed, all moneys on deposit. From these no deduction is made on account of debts due to depositors or to other persons, as the law requires, in assessing the personal property of an individual.   No trust company, organized as this company is organized, can do business under such a pressure of taxation.

This bank was organized when the currency of Ohio was
38 *

deranged, and embarrassments were general throughout the country.    The general bankrupt act followed, after the lapse of some years.    The agency of the Trust Company Bank, in distributing its capital in every county in the State, as required by its charter, conduced to correct the evils of a vitiated currency in the State; and, in that respect, has continued to exercise a salutary influence over its circulation.    These considerations, I am aware, have nothing to do with the constitutional question in the case, and I only advert to them in answer to the argument that this bank has no ground of complaint, as it is taxed on its property as if the property were in the hands of an individual.

Mr. Justice WAYNE dissented from the judgment of the court.

Mr. Justice CURTIS.

I dissent from the judgment of the majority of the court in this case.    I consider the twenty-fifth section of the charter of the company to be a contract by the State with the corporation, that the rate of taxation of this company shall not at any time be higher than the rate of taxation actually and legitimately imposed on banking institutions; that this contract is not complied with by passing an act to tax banks, which could not, and did not operate, in point of fact, to tax the banking institutions of the State; that what was bargained for and granted was not conformity to an inoperative general law, but conformity to the actual and legal rate of taxation of banks for the time being; and consequently, as when the tax in question was levied, the banking institutions existing in the State were not subject to the law under which the Life and Trust Company was taxed, and were not liable to pay the rate of taxation imposed on that company, the obligation of the contract of the State to impose on the Life and Trust Company no higher taxes than are or may be imposed on banking institutions, has been impaired; because when this tax was imposed it was a higher tax than was or could be legitimately imposed on the then existing banking institutions of the State.    I do not go into an extended examination of this subject, because it involves only a construction of this particular contract, and though important to the parties, is not of general interest.    Upon the other questions involved in the case, namely, as to the power of the legislature of Ohio to make a contract fixing the rate of taxation of certain property for a term of years, — as to the duty of this court to expound the contract whose obligation is alleged to be impaired — and the propriety of accepting the construction of the

constitution of the State which had been practised on by all the branches of its government, and acquiesced in by the people for many years, when the contract in question was made, I fully concur in the views of the chief justice, as expressed in his opinion.

Mr. Justice NELSON concurs with Mr. Justice CURTIS.

This cause came on to be heard on the transcript of the record from the District Court of the State of Ohio, for Hamilton county, and was argued by counsel; on consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the judgment and decree of the Supreme Court of Ohio, in this cause as remitted to the District Court of the State of Ohio for Hamilton county, and contained in the transcript of the record filed in this cause, be and the same is hereby affirmed, with costs, and interest at the same rate per annum that similar judgments or decrees bear in the courts of the State of Ohio.