[No. 37029. En Banc. August 7, 1963.]

THE STATE OF WASHINGTON, *on the Relation of Washington State Finance Committee, Petitioner,* v. TOM MARTIN, *as State Treasurer, Respondent.**

*The Attorney General, Preston, Thorgrimson, Horowitz, Starin & Ellis, Richard Thorgrimson, Edward Starin, Houghton, Cluck, Coughlin & Schubat,* and *Paul Coughlin, Special Assistants,* for petitioner.

*The Attorney General* and *Philip H. Austin, Assistant,* for respondent.

*Reported in 384 P. (2d) 833.

HALE, J.—Time is both enemy and friend to a good idea. Thoughts held clearly in the beginning may obscure and lose their outline as the present merges with the future and becomes the past again. Conversely, concepts vague in their beginnings may sharpen in form and shape by the passing of years and the force of events. So it is and was with *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651. Rising sharply in bold relief from the mists of state financing, this case declared a brave new doctrine in 1949; 14 years later the march of time and events has left us wondering. The *Gruen* case involved the issuance and sale of limited obligation bonds to be redeemed by excise taxes on cigarettes. It directly concerned an interpretation of the state constitution's provision on the debt limit. Art. 8, §§ 1, 3. So does this case.

The Washington State Finance Committee, an official agency of the state consisting of the Governor, the Lieutenant Governor and the Treasurer, acting through the Attorney General and his special assistants, brings this original petition for a writ of mandamus. It seeks a writ to compel the State Treasurer to sign and allow the issuance and sale of certain limited obligation bonds authorized by the 1961 Extraordinary Session of the Legislature. Events leading to this application are complicated; they come directly from our decision in *Gruen v. State Tax Comm., supra,* through many sessions of the state legislature.

In general, we are concerned with many bond revenue measures of the legislature enacted since 1949, but, in particular, with two acts of the legislature passed in 1961. Laws of 1961, Ex. Ses., chapter 3, p. 2521, approved into law by the Governor on March 28, 1961, directed the State Finance Committee to issue and sell $50,750,000 in limited obligation bonds prior to April 1, 1965. All of the money from the sale of the bonds was appropriated to the State Board of Education to be granted in aid of the school districts throughout the state for the construction of public schools. School districts, in order to share in the fund, are required to supply extra funds from the sale of bonds or

excess tax levies. Thus, the state supplies money for the construction of school buildings throughout the state and encourages the several school districts to raise money locally for school construction.

The bonds authorized by this act (Laws of 1961, Ex. Ses., chapter 3, p. 2521), are (1) to be designated as limited obligation bonds, (2) to contain language declaring that they are not a general obligation of the state, and (3) to be payable from the proceeds of the retail sales tax. The state, in this enactment, expressly undertakes to continue levying the sales tax in a sufficient amount to pay for the principal and interest of the bonds.[1]

In a similar fashion, the same session of the legislature, by Laws of 1961, Ex. Ses., chapter 23, p. 2656, in a bill signed into law by the Governor on April 3, 1961, directed the State Finance Committee to issue and sell limited obligation bonds in the sum of $27,556,000, to be expended for the construction of public buildings, including a correctional institution. Like its predecessor, the School Construction Bond Act (Laws of 1961, Ex. Ses., chapter 3, p. 2521), the bonds were to declare that they were redeemable from the proceeds of retail sales taxes with an obligation in the state to continue the levy of sufficient taxes to redeem the bonds and discharge them in full. The enactments, Laws of 1961, Ex. Ses., chapter 3, p. 2521, and Laws of 1961, Ex. Ses., chapter 23, p. 2656, spelled out the method of committing the sales tax revenue to the bond redemption and servicing charges as to both the School Bond Act and the Public Building Bond Act in the following language:

" . . . The state finance committee shall . . . certify to the state treasurer the amount needed in the ensuing twelve months to meet interest payments on and retirement

[1]" . . . Such bonds shall state distinctly that they shall not be a general obligation of the state of Washington, but shall be payable in the manner and from the proceeds of retail sales taxes as in this act provided. As a part of the contract of sale of the aforesaid bonds, the state undertakes to continue to levy the taxes referred to herein and to fix and maintain said taxes in such amounts as will provide sufficient funds to pay said bonds and interest thereon until all such obligations have been paid in full." Laws of 1961, Ex. Ses., chapter 3, § 1, p. 2521.

of bonds authorized by this act. The state treasurer shall thereupon deposit such amount in the . . . bond redemption fund . . . from moneys transmitted to the state treasurer by the tax commission and certified by the tax commission to be sales tax collections, and such amount certified by the state finance committee to the state treasurer shall be a prior charge against all retail sales tax revenues of the state of Washington, subject to and inferior only to amounts previously pledged for the payment of interest on and retirement of bonds heretofore issued. . . ."

The act for state building construction, as in the School Bond Act, contained an undertaking by the state to continue to levy and collect sales taxes until the bonds and interest were fully discharged.

By formal resolution, the State Finance Committee, obviously to save interest costs, proceeded to issue and sell the bonds in series, ostensibly as the money was needed to meet the purposes of the authorizing statutes.[2] The bonds were actually sold and delivered to the purchasers in accordance with the resolutions, the revenues derived therefrom being turned over for the construction of school buildings and facilities and other public buildings. Thus we see that the State Finance Committee proceeded in routine fashion to carry out the mandate of the statutes and provided money for the state's public schools and public buildings, a process made imperative by the rapidly expanding population, all against a background of curtailment during the recent war years.

On April 2, 1963, occurred the event which precipitated this action in mandamus.

The finance committee, obviously to reduce interest,

---

[2]Resolution No. 12, adopted December 20, 1961, authorized issuance and sale of Series A, Public School Plant Facilities Bonds, in amount of $10,000,000.

Resolution No. 24, adopted July 24, 1962, authorized issuance and sale of Series B, Public School Plant Facilities Bonds, in the amount of $15,000,000.

Resolution No. 11, adopted December 20, 1961, authorized issuance and sale of Series A and Series B, Public Building Bonds, in the amounts of $7,323,000 and $5,233,000 respectively.

Resolution No. 25, adopted July 24, 1962, authorized issuance and sale of Series C, Public Building Bonds, in the amount of $5,000,000.

elected to follow a policy of issuing the bonds only as the money was immediately needed to carry out the state's commitments to the school districts in their building programs and for the construction of public buildings. It encountered no serious difficulties until it adopted its resolutions Nos. 36 and 37 on April 2, 1963. On that date, the committee, at the request in writing of the State Superintendent of Public Instruction and the Director of the Budget —both declaring that the money was needed—sought to complete the bond issues authorized in the two acts of the 1961 Extraordinary Session of the Legislature, by issuing and selling Series C, Public School Plant Facility Bonds, in the amount of $25,750,000 and Series D, Public Building Bonds, in the amount of $10,000,000. Sale of these latter series would fulfill requirements of the statute as to the sale of the bonds.

Adoption of resolutions Nos. 36 and 37 by the finance committee triggered this proceeding. The State Treasurer declined to concur in them and gave notice in writing to the finance committee that he was obliged to question the legality of the final issue and sale of the bonds and that, until constitutionality of the resolutions had been established, he would neither sign nor give notice of the sale of the bonds. The letter of refusal was formal in tone and was designed to lay a predicate for a constitutional test.

By April 2, 1963, the State Board of Education had actually spent $17,588,350.72 of the Public School Plant Facility Bond money, and had allocated an additional sum of $29,789,461.62 to the various school districts for impending projects. The districts had entered into building contracts, with construction under way, to the extent of $18,032,681.23, and had entered into preliminary negotiations, studies and commitments for further construction running into many millions of dollars more.

The same situation prevailed with respect to the public building bonds. By April 1, 1963, $24,916,334 had been obligated by contract either for design or construction purposes and the anticipated remainder committed to projects in the designing stages.

What prompted the State Treasurer to question the constitutionality of the statutes prescribing, and the legality of the resolutions authorizing, the bond issues? The answer is found in a study of two decisions of this court that involve the issuance and sale of state bonds, *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651, filed November 5, 1949, and *State ex rel. Washington Toll Bridge Authority v. Yelle*, 61 Wn. (2d) 28, 377 P. (2d) 466, decided December 13, 1962.

That *Gruen* marked a departure in our views on the meaning of Article 8 of the Constitution of the State of Washington, which limits the state debt to $400,000, is apparent from the vigorous dissenting opinions it incited. In a labored opinion, this court upheld the sale of $80,000,000 in bonds with which to pay a World War II Veterans' Bonus, to be funded by excise taxes on cigarettes. It was held that the sale of these bonds did not constitute a debt of the State of Washington because (1) the act authorizing the bonds created a special fund for their redemption, and (2) obligations to be paid from excise taxes are not debts within the meaning of the constitution, ad valorem taxes being held to be the only taxes contemplated by the framers of the constitution.

From the time of its filing, despite the heavily supported dissent by four of the judges, *Gruen* marked a turning point in the fiscal procedure of this state. It speedily opened the door to a method of financing urgently needed by the state's rapidly expanding population, a method theretofore thought reserved exclusively to the slower, more cumbersome requirements of a vote of the people. Between *Gruen*, in 1949, and the adjournment of the Extraordinary Session of the 1963 Legislature, nearly two-thirds of a billion dollars in bonds were authorized by successive sessions of the legislature, of which more than one-half billion were actually issued. These vast sums of money were provided mainly for schools, public institutions and buildings, and highways. Principal sources of redemption were taxes on retail sales, motor vehicle excise taxes, and taxes on gasoline and other motor fuels. Only 85 million dollars in bonds were submitted

to and approved by a vote of the people. Of the total of 522 million dollars in bonds issued since *Gruen,* $356,718,000 in bonds are outstanding.[3] The outstanding bonds, including debt servicing costs, are being retired at about 35 million dollars per year from revenues provided by the various enactments authorizing their issuance. Although in the aggregate they seem to create a large debt, they actually represent but a modest commitment when related to the state's revenues, and would be fully paid, at the present rate of redemption, within 10 years.

On December 13, 1962, this court handed down the second of the two decisions referred to earlier, *State ex rel. Washington Toll Bridge Authority v. Yelle, supra,* an opinion which obviously induced the State Treasurer to question the efficacy of our holding in the *Gruen* case. Referring to the *Gruen* case and the fourteenth amendment to the Washington State Constitution prohibiting the suspension, surrendering or contracting away of the taxing power, a majority of the court said:

"We place no reliance on the reasoning of that opinion in arriving at our conclusion that there has been no violation of the constitutional provision to which we have just referred. . . ."

In a concurring opinion, two of the judges of the majority stated:

". . . I would make it unequivocally clear that . . . the *Gruen* case holding on the issue of what constitutes a state debt . . . is at least suspect and may not be followed, should those questions arise again . . . ."

One other judge concurred in this view of the *Gruen* case and two judges, in a dissenting opinion, stated, in effect, that the *Gruen* case permitted a violation of the constitution's debt limit provision (Art. 8).

So it seems that, even as the *Gruen* case was filed, the seeds of its possible dissolution were sown. Time became its enemy even though the state government, under stare decisis, was obliged to treat it as a guidepost in the funding

---

[3]See Appendix A.

of badly-needed projects throughout the state. Thus, a single excise on a lone commodity, limited and precise, placed in a special fund for the redemption of bonus bonds, could understandably appeal to the majority of the judges as not constituting a general obligation of the state and hence not violative of the state's debt limit; but the very logic of the holding authorized preemption of portions of the state's general revenues by each succeeding session of the legislature in the form of segregating future sales tax revenues into special funds. So it is that the reasoning of the minority in *Gruen,* clarified by time and events on the question of debt limitation, now seems more cogent and persuasive.

As in *Gruen,* we are again faced squarely with the enigma of the $400,000 debt limitation set forth in Art. 8, §§ 1 and 3, of the state constitution.

"The state may to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts, but such debts, direct and contingent, singly or in the aggregate, shall not at any time exceed four hundred thousand dollars ($400,000), and the moneys arising from the loans creating such debts shall be applied to the purpose for which they were obtained or to repay the debts so contracted, and to no other purpose whatever." Const. Art. 8 § 1.

"Except the debt specified in sections one and two of this article, no debts shall hereafter be contracted by, or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election, and all moneys raised by authority of such law shall be applied only to the specific object therein stated, or to the payment of the debt thereby created . . . ." Const. Art. 8 § 3.

I

## SPECIAL FUND DOCTRINE

It was the application of the special fund doctrine to

the excise taxes on cigarettes that gave rise to the *Gruen* decision. The court held that bonds payable from a special fund created by excise taxes on cigarettes, under a declaration that the general credit of the state not be pledged and that no resort be had to property taxation, was not a debt within the constitutional debt limitation. The debt limitation applied solely to debts payable from a general levy and not to excises. Essential to this holding is the belief that the framers of our constitution in 1889 had little or no knowledge of excise taxes when they drew up and propounded the constitution, as the territorial government derived its revenues almost exclusively from ad valorem taxes on realty.

But the first case to arise under the debt limitation article of the constitution does not seem to support the *Gruen* decision; indeed, the language of the case describing the special fund implies that, if the funds are derived from general taxation, they do not come within the meaning of a special fund. *Allen v. Grimes*, 9 Wash. 424, 37 Pac. 662 (1894). By the Enabling Act, Congress granted to the state 130,000 acres of land which were to be sold and the proceeds therefrom expended for the erection of public buildings at the state capital. The legislature created the "State Capitol Building Fund" with directions that all proceeds from the sales of these lands were to be deposited therein. It appropriated money for the erection of public buildings therefrom, with a proviso that there was to be no other appropriation for public buildings except from funds derived from the sale of these lands. Before any of the lands granted had been sold and any money deposited in the fund, relator, as a member of the State Capitol Commission, brought mandamus to compel the State Auditor to issue a warrant for his services and expenses—these being properly chargeable against the fund. The Attorney General defended "upon the ground that, under the provisions of art. 8 of the constitution, the issuance of the warrant claimed would create a debt against the state".

This court ventured into the special fund doctrine for the first time by saying: .

"It thus appears that the intention of the legislature is to limit all payments of money expended for the erection of a state capitol building to the money actually derived from the sale of the lands granted by the government; and, to make the intention the more apparent, the proviso to § 15 prohibits any appropriation, or more properly, payment from any other fund. The idea of the creation of a debt against the state is by the language used expressly negatived. There is under the law absolutely no obligation resting upon the state to pay any sum whatever, and those who may receive the auditor's warrants will be limited in their rights to the requirement of the proper officers to perform their duties as prescribed by the statute. Even were the law such that the state could be sued upon an ordinary contract the same as an individual, no cause of action could be stated against it by the holder of a warrant." *Allen v. Grimes, supra.*

The *Allen v. Grimes, supra,* ruling was confirmed in *State ex rel. Troy v. Yelle,* 36 Wn. (2d) 192, 217 P. (2d) 337 (1950), when we held that warrants drawn on the general fund in excess of the $400,000 constitutional limitation for current expenses did not constitute a debt, though bonds issued to fund such warrants probably would be a state debt in violation of the constitutional provision.

Thus, at the outset, we made it clear that revenues in the fund out of which the bonds were to be paid could not come from general taxation in any part and remain outside the debt limitation. Similarly, warrants authorized by the State Capitol Commission drawn upon the State Capitol Building Fund, a fund derived exclusively from the sale and lease of federally donated lands, was held good, there being no general taxes involved in *State ex rel. Attorney General v. McGraw,* 13 Wash. 311, 43 Pac. 176 (1895), although this precise constitutional provision was not mentioned. That this was thought to be a decision of bedrock stability is seen in the next important case involving Article 8 of the constitution, when, in *State Capitol Comm. v. State Bd. of Finance,* 74 Wash. 15, 132 Pac. 861 (1913), the mere guaranty of the principal and interest by the state of Capitol Building Construction Bonds—even though there appeared to be more than ample revenues derived from the sale of

public lands to discharge the bonds—was held to contravene the constitutional debt limitation of $400,000 fixed by Article 8. Counsel argued that, since the value of the capitol lands, the proceeds from the future sales of which were pledged to the payment of these bonds, exceeded the principal and interest of the bonds, the state would not be required to pay any part thereof out of its general revenues, and that the state was thereby incurring an obligation in form only and not in substance. The proposition was squarely put that the issuance of the bonds was not the creation of a state debt under Article 8.

Answering this thesis, we said:

". . . notwithstanding the possibility and even probability that the obligation sought to be so incurred will be eventually liquidated by funds derived from the sales of the capitol land, and thus the burden be entirely removed from the taxpayers, they must nevertheless be regarded as general state bonds for the purpose of investing the general school fund therein. They cannot be regarded as such, in our opinion, without violating both the spirit and the letter of the sections of article 8 of the state constitution above quoted."

There was little relief for the embattled State Capitol Commission, for scarcely had its bonds been struck down in *State Capitol Comm. v. State Bd. of Finance, supra,* when it again fought its way into court to sustain another issue of Capitol Building Bonds authorized by the legislature of 1915, in the case of *State ex rel. State Capitol Comm. v. Lister,* 91 Wash. 9, 156 Pac. 858 (1916). These bonds, as in *State Capitol Comm. v. State Bd. of Finance, supra,* were payable in principal exclusively from the State Capitol Building Fund which, in turn was built up solely from the sale of public lands granted to the state by the United States to finance the construction of public buildings. Laws of 1915, chapter 191, § 3, p. 700, added a minor provision that the State Board of Equalization levy a tax sufficient to pay the interest on the bonds, but that money so paid in interest was to be deemed *only* a loan from the general fund of the state, and any moneys so advanced were to be repaid to the general fund from the Capitol Building Fund after other

charges thereon had been paid. To add a constitutional fillip, provision was made that no money from the fund be expended until the Temple of Justice, the building where this court now sits, was paid for in full.

Despite the blandishment of this latter provision, giving priority to erection of this court's home, the entire bond issue was held invalid as violative of the debt limitation of the state constitution.

We said:

"Turning, then, to the word 'debt' in the constitution: Does it apply to the interest upon the bonds in question which is evidenced by the coupons attached. This interest becomes due at times and in amounts definite and certain. The plain purpose of providing in the constitution that 'no debts shall hereafter be contracted' was to prevent the taxpayers of the state from being called upon to meet obligations which had not been authorized by a vote of the people." *State ex rel. State Capitol Comm. v. Lister*, 91 Wash. 9, 15, 156 Pac. 858.

And, further:

"If the interest upon these bonds is not to be held a debt, then the door opens, notwithstanding the constitutional provision, for the legislature to bond the lands of the state which are set apart for the various public institutions, and require the interest thereon to be paid by general taxation. . . ."

Then, answering the suggestion that since interest could not be paid from general taxes without an appropriation and, thus, would not constitute a debt against the state but only against the fund, this court said:

"It is probably true that the money coming into the capitol building interest fund could not be applied in payment of the interest coupons until it was so appropriated by the legislature; but it may be asserted, with dogmatic certainty, that, if the bonds and coupons should be issued, at no time would the legislature refuse to make an appropriation for the purpose of meeting the matured interest coupons. Refusing to make the appropriation would be equivalent to repudiation of the obligation. Such a position on the part of the state is unthinkable. This, however, is beside the question. It is not what the legislature would or would not do; but can the debt be created and the money

collected from the taxpayers of the state without the people being heard upon the question when the constitution gives them this right. The act upon its face bears unmistakable evidence of a studied effort to circumvent the constitution. To hold that the interest coupons issued under the provisions of the act are not evidence of a debt, within the meaning of the constitution, would be to give judicial approval to a subterfuge."

Thus it is clear that, when any of the moneys going into the special fund or any of the credit to support the special fund are derived from general taxes, they constitute a state obligation.

So, the mere guaranty of principal and interest of Capitol Building Bonds, where it was highly improbable that any general tax funds whatever would ever be employed, was held to be a pledge of the general credit of the state and the contracting of an indebtedness in *State Capitol Comm. v. State Bd. of Finance, supra*; and even a loan of the interest from general taxes, with a guaranty of repayment of such interest back into the general fund, likewise was held to be outside the special fund doctrine as constituting a debt in violation of the constitution in *State ex rel. State Capitol Comm. v. Lister, supra*.

Nor was there any departure from this view in *State ex rel. State Capitol Committee v. Clausen*, 134 Wash. 196, 235 Pac. 364 (1925), where mandamus was granted to compel the Auditor to issue bonds for the construction of capitol buildings, which bonds were supported and redeemable by money in the Capitol Building Construction Fund. The fund derived its money from two sources, tax moneys levied at the rate of one-half mill on property, and the sale and lease of federally granted lands. The tax moneys were levied by an earlier act of the legislature, Laws of 1917, chapter 167, p. 776, and were to be paid into the Capitol Building Construction Fund to be used for the purchase of land, completion of buildings under construction, and the payment of interest on warrants outstanding against both the Capitol Building Fund and the Capitol Building Construction Fund. Laws of 1917, chapter 167, § 8, p. 778, stated

that all moneys derived from this one-half mill tax levy be deemed loans from the state and be returned to the state treasury from money derived from the lease, sale or disposition of the federal land grant, but such refund be made only after all bonds, warrants and outstanding obligations against the Capitol Building Fund had been paid. This court upheld the bonds in the *Clausen* case, presumably on the theory that the 1917 act levying the tax for the Capitol Building Construction Fund contained no language pledging its renewal by the state, and on the language of Laws of 1925, chapter 27, § 1, p. 61:

" . . . Such bonds shall . . . be payable only from the capitol building construction fund from revenues *hereafter* received from leases and contracts of sale heretofore made, and from leases and sales hereafter to be made, of lands, timber and other products from the surface, or beneath the surface, of the lands granted to the State of Washington by the United States, pursuant to an act of Congress approved February 22, 1889, for capitol building purposes. . . ." (Italics ours.)

We have some difficulty in reconciling the *Clausen* holding with the ruling in *State Capitol Comm. v. State Bd. of Finance, supra,* and *State ex rel. State Capitol Comm. v. Lister, supra,* because of the provisions in the 1917 act which allowed a general tax to be levied at one-half mill to be available as a loan for the payment of interest on building construction bonds. It could well be that the court chose to regard this levy as a part of a pay-as-you-go program and not in any way the creation of a debt against the state.

At any rate, the language of the *Clausen* case cannot be said to support the *Gruen* decision, for it is stated in *Clausen*:

"The legislative act under discussion expressly provides that the principal and interest of the bonds authorized shall be payable only from revenues hereafter received from the lease and sale of the granted lands. In no possible way is the credit of the state involved. Not one dollar of its general property can be used to discharge those bonds or the interest on them. Not one dollar of taxes can be put to that purpose. The state is only carrying into effect the trust imposed on it, which is to use these granted lands or

moneys derived from them to construct capitol buildings. Its only obligation under this act is to see that all the revenues hereafter received from the lease or sale of the granted lands shall be applied towards the payment of these bonds and their interest. On no principle of law can it be said that, under these circumstances, any debt has been contracted 'by or on behalf of this state.'" *State ex rel. State Capitol Committee v. Clausen*, 134 Wash. 196, 235 Pac. 364.

We have studied all of the other cases from this jurisdiction cited in *Gruen* on the question of state debt limitation, the only problem of constitutional law in the *Gruen* case concerning us now, and we get little help from any of them.

*Winston v. Spokane*, 12 Wash. 524, 41 Pac. 888 (1895), simply holds that revenue bonds for the construction of a municipal water works, payable exclusively from 60 per cent of the revenues of the water system, did not violate Article 8, § 6 of the state constitution, the section limiting the indebtedness of municipalities. The reasoning of this case supports the view that the special fund doctrine is a sound one where all moneys in the fund are derived from revenues produced from the object created by the bonds. And the idea that the special fund only is liable for warrants on bonds issued against it, and is not a general obligation or debt, is made clear in *Potter v. Whatcom*, 25 Wash. 207, 65 Pac. 197 (1901) where street improvements, authorized by ordinance, to be paid for only from assessments upon property fronting the improved streets, were allowed as charges only upon the assessment fund and did not constitute a debt chargeable against the general fund of the city. Hence, when the assessments proved insufficient to pay off the warrants, the city was held not liable to pay the warrants from its general fund since it neither expressly contracted to pay the warrants nor did it collect the fund and misappropriate.

Nor does *Comfort v. Tacoma*, 142 Wash. 249, 252 Pac. 929 (1927), support *Gruen*. There a guaranty fund was provided by the city from taxes, for the payment of local improvement district bonds, being limited to 5 per cent of the bonds outstanding. This was held to be merely a contingent liability and not a debt of the city. The holding

was based on the view that the local improvement bonds themselves, issued as they were without the guaranty, were not debts of the city, but debts only of the special assessment funds, and the court should not anticipate that the assessments would be inadequate or that any of the guaranty fund would be required to pay any of the bonds. It gives no support to respondent's position here or to the special fund doctrine as contemplated by the *Gruen* case.

The *Gruen* decision was handed down upon the reasoning that, if bonds are payable from a special fund and the special fund is in turn filled or replenished in whole or in part from excise taxes, the promise to levy the excise taxes to keep the fund solvent does not constitute a debt within the meaning of our constitution. There the special fund theory is neatly coupled to the excise taxes on the basis that excise taxes were not known to the framers of our constitution and, hence, that the use of the word "debt" must necessarily be restricted to mean only those obligations which were payable from the kind of taxes known to the constitutional convention, *i.e.*, ad valorem taxes.

But we find no authority for this proposition in our case law other than the assertion contained in Gruen, *i.e.*, that the framers of the constitution had little or no knowledge of excises and that, when they used the word "debt" in our constitution, they therefore referred to an obligation payable only out of ad valorem taxes. On the contrary, we think that the men who drew up the constitution of 1889 knew of excises as one means of providing revenue for the general government, but in addition were mindful of the Constitution of the United States, Art. 1, § 8, of which reads:

"The congress shall have power to lay and collect taxes, duties, imposts and *excises*, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts and *excises* shall be uniform throughout the United States; . . ." (Italics ours.)

That they did not, at the outset, choose to levy any excises in the first postconstitutional session of the legislature does not convince us that they were oblivious of the power

to do so in the future. And though conceivably the men who drafted the state constitution may have been ignorant of excise taxes, we are sure that they had no knowledge whatever of the special fund doctrine, for it had not yet been invented.

 That the special fund doctrine is a useful and valid tool of government is apparent when one thinks of all of the institutions and devices of government supported by it. But the true test of its application here is not what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge, or the operation of the State Liquor Control Board, or from sales or leases of publicly owned lands, any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state. Hence, we must take care that the employment of peripheral doctrines does not lead us away from the main point of the case. What is a debt of the State of Washington? Any obligation which must in law be paid from any taxes levied generally is, we think, a debt of the state. It matters little whether the tax be ad valorem or an excise.

Our views in this re-examination of the special fund doctrine, as it applies to Article 8, §§ 1 and 3 of the state constitution on the question of debt limitation, are, we think, confirmed by the subsequent motor vehicle fuel tax amendment. In 1944, the people of this state adopted amendment 18 to the state constitution which provides that all revenues derived from excise taxes on motor vehicle fuels, license fees, and other revenues for highway purposes, be kept in a special fund and used for highway purposes only. Bonds issued against this fund were correctly held not violative of Article 8, §§ 1 and 3, in *State ex rel. Bugge v. Martin*, 38 Wn. (2d) 834, 232 P. (2d) 833 (1951), where it was pointed out in a concurring opinion that the very restric-

tion of the fund to the revenues from specifically authorized constitutional sources saved the bonds from any doubts inhering in the *Gruen* decision.

We think that amendment 18 should have been given greater weight when the *Gruen* case came on for hearing as a persuasive adjunct to the idea that the creation of a special fund alone, from which an obligation would be paid, does not make the obligation any less a state debt if it is promised that general taxes are to go into the fund.

We are now convinced that the 80 million dollars in limited revenue bonds authorized by Laws of 1949, chapter 180, p. 496 for the payment of a bonus to veterans issued against the War Veterans' Compensation Fund, financed by excises upon the retail sales and handling of cigarettes, containing as it did an express promise by the state to continue to levy such taxes until the bonds and interest thereon were paid, did create an 80 million dollar debt against the state without a vote of the people. And it is, and was, a debt of the state despite the assertion in § 12 of that act that the same " . . . not be construed to constitute a pledge of the general credit of the State of Washington." Neither the finespun reasoning of the majority opinion in *Gruen* nor the cases from other jurisdictions are very convincing on the question of debt limitation. When the legislature bonded the state's revenues in 1949 by promising to maintain the excises on cigarettes until the $80,000,000 veterans' bonus was paid in full, it in fact put the state in debt without a vote of the people in violation of Article 8, §§ 1 and 3.

Though the passing of time has, we hope, served to clarify our thinking on the problem of debt limitation under the *Gruen* case, we must, nevertheless, reaffirm it as to all matters for which it may be deemed authority until the remittitur is filed in the instant case, for *Gruen* has been cited with approval more than 25 times by this court without hints as to its precarious standing on many of its various phases, except that of debt limitation. On the question of debt limitation, *Gruen* has been cited only once, *Municipality of Metropolitan Seattle v. Seattle*, 57 Wn. (2d) 446,

357 P. (2d) 863 (1960), to affirm the principle that obligations payable from a special fund and solely from anticipated service revenue do not constitute a debt within the meaning of a constitutional debt limitation. Not until our decision in *State ex rel. Washington Toll Bridge Authority v. Yelle, supra*, came down did this court imply that *Gruen* might not be held to express the law of this state on the question of debt limitation under Article 8, §§ 1 and 3. Thus it was that officers of state government, officials of the various school districts, contractors and workmen on public school building projects, lending and investment institutions, both public and private, were entitled to accept the *Gruen* holding at face value, act under it, and be guided by it, as the ultimate expression of the law of this state on the points directly involved in it. They had a right to rely on the *Gruen* decision and to apply it; hence, we cannot rightly look backward in overruling *Gruen* on this debt limitation problem, but must, of necessity, require that the effect of the instant decision be prospective and look to the future only. Looking to the future, then, we are thus obliged to and do overrule *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651 (1949), in so far as it purports to hold that the issuance and sale of limited obligation bonds funded by excise taxes on the sales and handling of cigarettes did not contravene Article 8, §§ 1 and 3, of the state constitution, and as to all future enactments cognizable under the debt limitation ruling of that case, we declare it is no longer the law.

## II

### PROSPECTIVE OVERRULING

Since the effect of our overruling of the *Gruen* case is prospective only and does not jeopardize the massive contractual and governmental enterprises done under its protective shield, we should discuss to some extent this perhaps novel, but well-established, principle of law.

We wish that we could view our role as judges with the Olympian detachment expressed by the ancient writers

who, when called upon to overturn a decison, could indulge the philosophy that, since judges did not make but simply found the law, the overruled decision was not and never had been the law. This classic doctrine, coming to light in the search for the very origins of judicial power, became known as the declaratory theory.[4] Under the declaratory theory, judges do not make the law, but declare it; a judicial decision merely asserts a principle that is and always has been. It follows then, under the declaratory theory, that an overruled decision is not merely poor law, nor bad law, nor erroneous law, but rather that it has never been the law. What is overruled is not *the* law, but nonlaw. Whereupon, if one accepts this ancient declaratory doctrine, it follows further that, since the overruling decision does not overturn the law nor substitute a better rule for a bad one, the overruling decision must be held to be retroactive in operation to square with the declaratory theory that it declares what always has been the law.[5]

To overrule *Gruen,* we need not revive the ancient polemics on the origins of judicial power, but rather our aim is to show that stare decisis is dependent neither upon

[4] Limitation of Judicial Decisions to Prospective Operation, 46 Iowa L. Rev. 600 (1961).

[5] ". . . For it is an established rule to abide by former precedents, where the same points come again in litigation: as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion; as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from according to his private sentiments: he being sworn to determine, not according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one. Yet this rule admits of exception, where the former determination is most evidently contrary to reason; much more if it be clearly contrary to the divine law. But even in such cases the subsequent judges do not pretend to make a new law, but to vindicate the old one from misrepresentation. For if it be found that the former decision is manifestly absurd or unjust; it is declared, not that such a sentence was *bad law,* but that it was *not law;* . . ." 1 Sharswood's Blackstone's Commentaries 63, 69 (1859 ed.).

the declaratory theory of the early writers nor does it require retroactive operation of all overruling decisions.[6]

Adherence to precedent is the nucleus of our judicial system; it binds the whole to all its parts and the parts to each other. Sometimes this concept is called stare decisis.

■ Through stare decisis, the law has become a disciplined art—perhaps even a science—deriving balance, form and symmetry from this force which holds the components together. It makes for stability and permanence, and these, in turn, imply that a rule once declared is and shall be the law. Stare decisis likewise holds the courts of the land together, making them a system of justice, giving them unity and purpose, so that the decisions of the courts of last resort are held to be binding on all others.

Without stare decisis, the law ceases to be a system; it becomes instead a formless mass of unrelated rules, policies, declarations and assertions—a kind of amorphous creed yielding to and wielded by them who administer it. Take away stare decisis, and what is left may have force, but it will not be law.

Yet there is another impelling reason, frequently overlooked, for stare decisis. The very ideal of equal justice under law, and the aspiration that one man shall be treated exactly like every other man under the same circumstances depends upon it. One has a right to know that the rules which govern him and his fellows today are a safe guide for his conduct tomorrow. And, curiously enough, though the ideals of uniformity and equality pervade the law, in part by means of stare decisis, it is here that the doctrine of prospective overruling enters.

To be uniformly applied, and equally administered, the rules of law should be both just and adaptable to the society they govern. A bad law uniformly administered is

---

[6] Realist Jurisprudence and Prospective Overruling, 109 U. Pa. L. Rev. 1 (1960); Limitation of Judicial Decisions to Prospective Operation, 46 Iowa L. Rev. 600 (1961); Retrospective Operation of Overruling Decisions, 35 Ill. L. Rev. 121 (1940); Prospective Operation of Decisions Holding Statutes Unconstitutional or Overruling Prior Decisions, 60 Harv. L. Rev. 437 (1947).

equally unjust and uniformly bad. If a rule laid down by the courts proves in time to be a bad one, applying the bad rule evenly does not provide equal justice for all. It may be equal, but it will not be justice. And courts are instituted among men to do justice between them, and between men and their government. So, to do justice, courts have devised a means of getting rid of bad rules, yet, at the same time, preserving stare decisis. Rules of law, like governments, should not be changed for light or transient causes; but, when time and events prove the need for a change, changed they must be.

If rights have vested under a faulty rule, or a constitution misinterpreted, or a statute misconstrued, or where, as here, subsequent events demonstrate a ruling to be in error, prospective overruling becomes a logical and integral part of stare decisis by enabling the courts to right a wrong without doing more injustice than is sought to be corrected. By means of this doctrine, courts of the most prudent and careful tradition can move boldly to right the very wrong they have been traditionally perpetuating under the old, rigidly-applied, single-minded view of the doctrine of stare decisis. The courts can act to do that which ought to be done, free from the fear that the law itself is being undone.

And prospective overruling has yet another virtue hitherto unnoticed; it tends to stay the courts from engaging in pedantic exercises by freeing them from the heavy hand of the old declaratory theory of stare decisis. Under prospective overruling, courts need not strive for distinctions where none exist in order to escape the implications of a bad rule. Better to overrule a case flatly, and say so, giving the overruling decision prospective effect, than attain the same end through sophistry and evasion. In the long run, a search for distinctions, where there are no real differences, in order to bring a case to a just conclusion, contributes more to uncertainty in the law than does an outright reversal of policy and cancels two of the things upon which the law depends—reason and experience. A study of the cases and authorities will, we think, bear this out.

The idea of a prospective overruling of precedent is not recent, but has been applied in effect without a label for more than a century. Of historic interest is a series of cases coming from Mississippi in the 1840's, arising from suits on notes given as consideration for the purchase of slaves (*Groves v. Slaughter,* 40 U. S. 286 (15 Peters 449) 10 L. Ed. 800 (1841)), after the adoption in 1832 of a constitutional provision prohibiting the introduction of slaves into Mississippi as merchandise or for sale after May 1, 1833.

The Supreme Court of the United States, affirming what it considered to be the decisions of the Mississippi Supreme Court, upheld the notes as valid in the *Groves* case, *supra,* despite the possible illegality of the transaction.

A few years later, the identical problem came before the Supreme Court in *Rowan v. Runnels,* 46 U. S. 158 (5 Howard 134) 12 L. Ed. 85 (1847), from Mississippi, but it appeared that, in the meanwhile, the Mississippi Supreme Court had changed its views from those indicated in *Groves v. Slaughter, supra,* and had subsequently held contracts for the sale of imported slaves to be illegal and notes given in purchase of such slaves void. Anticipating the doctrine of prospective overruling, the Supreme Court in an opinion by Chief Justice Taney said:

". . . Undoubtedly this court will always feel itself bound to respect the decisions of the State courts, and from the time they are made will regard them as conclusive in all cases upon the construction of their own constitution and laws.

"But we ought not to give to them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other States, which in the judgment of this court were lawfully made. . . ." *Rowan v. Runnels, supra.*

And the United States Supreme Court amplified this statement in *Ohio Life Ins. & Trust Co. v. Debolt,* 57 U. S. 442 (16 Howard 416) 14 L. Ed. 997 (1853), when, in referring directly to *Rowan v. Runnels, supra,* it pointed out that the doctrine of that case would apply with equal force to contracts between citizens of the same state as well as with citizens of different states.

"Indeed, the duty imposed upon this court to enforce contracts honestly and legally made, would be vain and nugatory, if we were bound to follow those changes in judicial decisions which the lapse of time, and the change in judicial officers, will often produce. The writ of error to a State court would be no protection to a contract, if we were bound to follow the judgment which the State court had given, and which the writ of error brings up for revision here. And the sound and true rule is, that if the contract when made was valid by the laws of the State, as then expounded by all the departments of its government, and administered in its courts of justice, its validity and obligation cannot be impaired by any subsequent act of the legislature of the State, or decision of its courts, altering the construction of the law." *Ohio Life Ins. & Trust Co. v. Debolt, supra.*

In this fashion, the supreme court anticipated the doctrine of prospective overruling by giving prospective effect only to the overruling decisions of the state courts, yet all the while declaring the decisions of those courts to be the final expressions of the law on the peculiar subjects involved.

Perhaps the most important case in the evolution of the doctrine of prospective overruling is the opinion of Justice Cardozo in *Great Northern R. Co. v. Sunburst Oil & Refining Co.*, 287 U. S. 358, 77 L. Ed. 360, 53 S. Ct. 145, 85 A.L.R. 254 (1932). We are not concerned here with the constitutional aspects of that decision, but only with the legal effect of an overruling decision. In 1921, the Supreme Court of Montana in *Doney v. Northern Pac. R. Co.*, 60 Mont. 209, 199 Pac. 432, had held that a shipper could recover excessive freight charges where the tariffs were found to be unreasonable, even though the Montana Board of Railroad Commissioners, empowered by law, had fixed and published the freight tariffs.

Several years later, the Supreme Court of Montana in two decisions, *Montana Horse Products Co. v. Great Northern R. Co.*, 91 Mont. 194, 7 P. (2d) 919, and *Sunburst Oil & Refining Co. v. Great Northern R. Co.*, 91 Mont. 216, 7 P. (2d) 927, overruled the *Doney* case, *supra,* but reserved

the effect of the overruling decisions to future shipments only. The *Doney* case was expressly declared to be the law as to all shipments made during the period of its reign, for all persons who had acted under it. The effect of the decisions overruling it would, accordingly, be prospective only in most instances, and the shipper was allowed recovery for unreasonably excessive charges assessed and paid under the official tariff schedules, though the decisions of the Montana Supreme Court made it clear on rehearing that recovery would be denied in such cases in the future. *Sunburst Oil & Refining Co. v. Great Northern R. Co., supra.* The Supreme Court of the United States, in upholding the doctrine of prospective overruling had this to say:

" . . . This is a case where a court has refused to make its ruling retroactive, and the novel stand is taken that the constitution of the United States is infringed by the refusal.

"We think the federal constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. . . . The common law as administered by her judges ascribes to the decisions of her highest court a power to bind and loose that is unextinguished, for intermediate transactions, by a decision overruling them. As applied to such transactions we may say of the earlier decision that it has not been overruled at all. It has been translated into a judgment of affirmance and recognized as law anew. Accompanying the recognition is a prophecy, which may or may not be realized in conduct, that transactions arising in the future will be governed by a different rule. If this is the common law doctrine of adherence to precedent as understood and enforced by the courts of Montana, we are not at liberty, for anything contained in the constitution of the United States, to thrust upon those courts a different conception either of the binding force of precedent or of the meaning of the judicial process." *Great Northern R. Co. v. Sunburst Oil & Refining Co., supra.*

We note that the doctrine had not yet attained full vigor but was still geared to the concept that the overruling in futuro was in some way connected with the idea that it was more a prophecy of what the law would be in the future, than a declaration of a rule of law. Not so the doctrine today. We no longer need measure the niceties of stare decisis which heretofore have characterized adherence to precedent. The doctrine of prospective overruling is confirmed and *Great Northern R. Co. v. Sunburst Oil & Refining Co., supra,* is cited with approval in *Garner v. Louisiana,* 368 U. S. 157, 7 L. Ed. (2d) 207, 82, S. Ct. 248 (1961).

Experience and reason have combined to cut away the strictures binding the doctrine to the declaratory theory, and, thus liberated, it is now revealed to us as a true component of stare decisis. For example, the Supreme Court of Wisconsin, after tracing the doctrine of governmental immunity of cities and towns in tort actions in *Holytz v. Milwaukee,* 17 Wis. (2d) 26, 115 N.W. (2d) 618 (1962), an immunity first declared by that court in 1873, found the immunity doctrine to be faulty and erroneous and not supported by the historic reasons claimed for it, and, accordingly, overruled a long line of cases. Yet, to avoid working an unjust hardship on municipalities, the court expressly made the overruling decision prospective in operation as of a day certain in the following language:

"To enable the various public bodies to make financial arrangements to meet the new liability implicit in this holding, the effective date of the abolition of the rule of governmental immunity for torts shall be July 15, 1962. . . . The new rule shall not apply to torts occurring before July 15, 1962. . . ."

The same doctrine of prospective overruling was applied with respect to the immunity of charitable hospitals in *Kojis v. Doctors Hospital,* 12 Wis. (2d) 367, 107 N. W. (2d) 292 (1961). Likewise, the Supreme Court of Illinois held the doctrine of prospective overruling compatible with stare decisis when it overturned the long-standing immunity of school districts to liability for torts in *Molitor v. Kaneland*

*Community Unit Dist. No. 302,* 18 Ill. (2d) 11, 163 N. E. (2d) 89 (1960), and made the operation of the overruling decision prospective. To the same effect is *City of Fairbanks v. Schaible,* 375 P. (2d) 201 (Alaska, 1962).

That elemental justice forces prospective overruling in many cases is evident from the case of *Florida Forest & Park Ser. v. Strickland,* 154 Fla. 472, 18 So. (2d) 251 (1944). There the plaintiff, a workman, was wounded on the job by a fellow employee and sought compensation under the Florida Workmen's Compensation Act. His claim was denied by a deputy commissioner and he appealed. During the course of the appeal, the Supreme Court of Florida handed down a decision (*Tigertail Quarries, Inc. v. Ward,* 154 Fla. 122, 16 So. 812 (1944)), holding that an appeal from the order of an individual deputy commissioner did not lie —only the orders of the full commissioner were appealable —and expressly overruling the case of *Johnson v. Midland Constructors,* 150 Fla. 353, 7 So. (2d) 449 (1942), which had held otherwise. Holding that even though the overruling decision had not fixed the time of its taking effect, the court said:

"Ordinarily, a decision of a court of last resort overruling a former decision is retrospective as well as prospective in its operation, unless specifically declared by the opinion to have a prospective effect only. . . . To this rule, however, there is a certain well-recognized exception that where a statute has received a given construction by a court of supreme jurisdiction and property or contract rights have been acquired under and in accordance with such construction, such rights should not be destroyed by giving to a subsequent overruling decision a retrospective operation. . . ." *Florida Forest & Park Ser. v. Strickland, supra.*

That decisions will be given prospective effect in the field of ad valorem taxation is shown in *Southern Pac. Co. v. Cochise Cy.,* 92 Ariz. 395, 377 P. (2d) 770 (1963), where the plaintiff railroad claimed that its properties were assessed by the State Tax Commission at 89 per cent of market value, whereas other property in the state was

assessed at 20 per cent of market value. In a decision upholding the railroad's claim, the court, nevertheless, found it necessary to give future effect only to its ruling, when it said:

"We take judicial notice that the taxing subdivisions of the state have long predicated their fiscal affairs upon the practices alleged in appellant's complaint. For example, school districts have been organized and have issued bonds for capital improvements pursuant to the authority granted by the Constitution . . . in anticipation of continued revenues derived from the taxation practices now complained of. . . .

". . .

"The principle that the decision will be made prospective only is not unknown. Where judicial interpretations of taxing acts have been overruled resulting in hardship, we have not hesitated to direct the decison to the future only. . . ."

Accordingly, the relief granted commenced with the taxable year next ensuing. This view on prospective overruling is directly supported in *Button v. Drake,* 302 Ky. 517, 195 S.W. (2d) 66, 167 A.L.R. 1046 (1946), and *Commonwealth v. Whitelaw,* 302 Ky. 526, 195 S.W. (2d) 71 (1946).

And the doctrine is well known, too, in probate law. In *Phillips Exeter Academy v. Gleason,* 102 N. H. 369, 157 A. (2d) 769 (1960), it is said:

"When a decision overrules earlier precedents it may be given retroactive effect but there is no constitutional requirement that it must be. *Great Northern Ry. Co. v. Sunburst Co.,* 287 U. S. 358; Opinion of the Justices, 95 N. H. 533, 536. Particularly in probate matters where previous decisions are overruled this jurisdiction has frequently stated that the overruling decision will not be applied retroactively to the detriment of those who had previously relied on the former decisions. . . ."

For a declaration of a similar rule in the area of criminal law, see *Commonwealth ex rel. Almeida v. Rundle,* 409 Pa. 460, 187 A. (2d) 266 (1963). In a decision which places strong emphasis on stare decisis, the Supreme Court of

California said, in a case involving the question of procedural timeliness, that in an overruling decision matters of procedure would have to be prospective in operation so as to preserve the remedy to parties litigant who acted under the overruled decision. This holding was based on the reason that fairness alone induced the result. *Auto Equity Sales v. Superior Court of Santa Clara Cy.*, 20 Cal. Rptr. 321, 369 P. (2d) 937 (1962).

So it is that the doctrine of prospective overruling has attached in many areas: in constitutional law, contracts, torts, criminal law, taxation, and in the field of procedure, giving the doctrine both sanction and acceptance throughout our jurisprudence. Prospective overruling imparts that final degree of resilience, to the otherwise rigid concepts of stare decisis, so necessary to prevent the system from becoming brittle. It enables the law under stare decisis to grow and change to meet the ever-changing needs of an ever-changing society and yet, at once, to preserve the very society which gives it shape. It follows, then, that to overrule *Gruen v. State Tax Comm. supra,* prospectively makes good sense and good law.

■ To give precise definition to our ruling here, and by way of summary, we now declare that *Gruen v. State Tax Comm.* 35 Wn. (2d) 1, 211 P. (2d) 651 (1949), erroneously allowed the state to exceed the debt limitation of $400,000 fixed by Article 8 of the Constitution of the State of Washington; the case is overruled prospectively, and the overruling is not retroactive; the bonds issued and to be issued and sold pursuant to Laws of 1961, Ex. Ses., chapter 3, p. 2521, and Laws of 1961, Ex. Ses., chapter 23, p. 2656, are lawful and valid and shall be issued in accordance with the terms of the statutes authorizing them; all bonds authorized by preceding sessions of the legislature under *Gruen* are valid; limited obligation bonds authorized by Laws of 1963, Ex. Ses., chapter 26 (Senate Bill No. 9), do not come within the *Gruen v. State Tax Comm.*, 35 Wn. (2d) 1, 211 P. (2d) 651 (1949), ruling, and will, therefore, put the state in debt beyond its constitutional debt limit,

and, accordingly, § 8 of the act (Laws of 1963, Ex. Ses., chapter 26 (Senate Bill No. 9)) providing for submission to a vote of the people should be invoked.

The writ of mandamus will issue, directing the State Treasurer to complete the issuance and sale of the bonds authorized by Laws of 1961, Ex. Ses., chapter 3, p. 2521, and Laws of 1961, Ex. Ses., chapter 23, p. 2656.

It is so ordered.

OTT, C. J., FINLEY, WEAVER, ROSELLINI, HUNTER, and HAMILTON, JJ., concur.

HILL, J., (concurring specially)—I am in complete accord with the majority opinion in its determination that the *Gruen* case[7] is overruled insofar as it purports to hold that no state debt is incurred by the issuance and sale of limited obligation bonds if they are to be paid from excise taxes.

I agree further that the overruling of the *Gruen* case, and its theory of what constitutes a debt, cannot be permitted to operate retroactively, and that bonds heretofore issued and sold in reliance upon that decision are valid and must be paid.

I also agree that, under certain circumstances, bonds, authorized in reliance upon that decision and not yet issued and sold, may be issued and sold. The state should fulfill its commitments made in reliance on that decision. I would limit the issuance and sale of Public School Plant Facilities Bonds to an amount necessary to enable the state to fulfill its commitments to school districts which have commenced construction, using their available funds in reliance upon such commitments, to make possible the completion of their projects. I would limit the issuance and sale of Capitol Improvement Project Bonds to an amount necessary to enable the state to fulfill its existing commitments on projects now under way.

It is my view, therefore, that the Writ of Mandamus to the State Treasurer should be limited to directing him to

[7] *Gruen v. State Tax Comm.* (1949), 35 Wn. (2d) 1, 211 P. (2d) 651.

APPENDIX A

STATE BONDS ISSUED UNDER SUPERVISION OF STATE FINANCE COMMITTEE

May 1, 1963

(millions of dollars)

| | Authority | Amount Authorized | Issued | Authorized Not Issued | Balance Outstanding | Bonds Outstanding— Total Debt Service Require | Average Annual Debt Service Requirement | Revenue Pledged |
|---|---|---|---|---|---|---|---|---|
| War Veterans' Comp | Ch. 180, Laws 1949 } Ch. 292, Laws 1955 | 80.0 | 77.75 ① | 2.25 | 34.221 | 37.51 | 4.50 | Cig Tax |
| School Building Constr | Ch. 229, Laws 1949 | 40.0 | 40.0 | ...... | 18.704 | 20.41 | 2.55 | Sales Tax |
| | Ch. 7, Ex 1953 | 20.0 | 20.0 | ...... | 2.475 | 2.51 | ......② | M V Excise |
| | Ch. 3, Ex 1955 | 30.0 | 30.0 | ...... | 15.65 | 18.03 | 2.25 | Cig Tax |
| | Ch. 234, Laws 1957 | 52.0 | 52.0 | ...... | 37.93 | 46.01 | 4.68 | M V & Cig |
| | Ch. 8, Ex 1959 | 34.0 | 34.0 | ...... | 31.61 | 42.76 | 2.41 | Cig Tax |
| | Ch. 3, Ex 1961 | 50.75 | 25.0 | 25.75 | 24.655 | 33.16 | 1.75 | Sales Tax |
| | Ch. 26, Ex 1963 | 59.00 | ...... | 59.00 | ...... | ...... | ...... | M V Excise |
| Institutional & Public Building Bonds | Ch. 230, Laws 1949 | 20.0 | 20.0 ① | ...... | 9.352 | 10.20 | 1.28 | Sales Tax |
| | Ch. 298, Laws 1957 | 19.875 | 19.875 | ...... | 15.795 | 20.07 | 1.43 | Sales Tax |
| | Ch. 299, Laws 1959 | 25.0 | 25.0 ① | ...... | 21.35 | 27.55 | 1.72 | Sales Tax |
| | Ch. 9, Ex 1959 | 10.089 | 10.089 | ...... | 8.92 | 11.85 | .74 | Sales Tax |
| | Ch. 23, Ex 1961 | 27.556 | 17.556 | 10.0 | 17.373 | 23.78 | 1.25 | Sales Tax |
| Highway | Ch. 121, Laws 1951 | 66.704 | 66.704 | ...... | 45.605 | 55.14 | 3.98 | Gas Tax |
| | Ch. 154, Laws 1953 | 18.0 | 18.0 | ...... | 13.335 | 16.88 | 1.22 | Gas Tax |
| | Ch. 311, Laws 1955 | 4.3 | 3.3 | 1.0 | 2.09 | 2.34 | .23 | Gas Tax |
| | Ch. 189, Laws 1957 | 75.0 | 45.0 | 30.0 | 43.31 | 55.46 | 3.88 | Gas-Fed Aid Fds |
| | Ch. 206, Laws 1957 | 3.0 | 2.0 | 1.0 | 1.48 | 1.75 | .19 | Gas Tax |
| World Fair | Ch. 174, Laws 1957 } Ch. 152, Laws 1961 | 10.5 | 10.4 | .1 | 7.625 | 10.01 | .77 | Corp Fees |
| Administrative Bldgs | Ch. 255, Laws 1959 } Ch. 25, Ex 1961 | 7.0 | 5.39 | 1.61 | 5.238 | 8.86 | .35 | Rental Revenue |
| | | 652.774 | 522.064 | 130.710 | 356.718 | 444.28 | 35.18 | |

① General Obligation Bonds.
② Issue paid in full, 6/1/63.

complete the issuance and sale of so many of the bonds, authorized by the Laws of 1961, Ex. Ses., chapter 3, p. 2521, and Laws of 1961, Ex. Ses., chapter 23, p. 2656, as may be necessary to meet commitments made for the completion of school plant facilities and capitol improvement projects now under construction.

I do not share fully in the majority's enthusiasm for "Prospective Overruling." I know of no way by which this court can bind tomorrow's court to decide a certain issue in a certain way. I can see great value to the trial bench, the bar, and the legislatures, in indicating that a change is contemplated in an established rule; but that is not a prospective overruling.

As of December 13, 1962,[8] a majority of this court had indicated that they undoubtedly would not follow the *Gruen* case. Consequently, the 1963 legislature hedged its legislation,[9] and, while it provided for a 59 million dollar bond issue for public school plant facilities, payable from retail sales taxes, it also provided that, if this court held the issue of bonds to be invalid as constituting a state debt, it should be referred to the people under the provisions of Art. 8, § 3, of the state constitution at the next general election.

The majority hold, and I agree, that this 59 million dollar bond issue would constitute a state debt and put the state beyond its constitutional debt limit, and that, therefore, it should be submitted to the people at the next general election as the legislature provided.

In the main my only disagreement with the holding of the majority (and that may be entirely academic)[10] is that I would not hold all bonds, authorized but not yet issued pursuant to Laws of 1961, Ex. Ses., chapter 3, p. 2521 (Public School Plant Facilities Bonds), and Laws of 1961, Ex.

[8]*State ex rel. Washington Toll Bridge Authority v. Yelle* (1962), 61 Wn. (2d) 28, 377 P. (2d) 466.

[9]Chapter 26, Ex. Ses., 1963.

[10]If the entire amount of the unissued bonds is needed for the commitments to which reference has been made, then I am in accord with the majority.

Ses., chapter 23, p. 2656 (Capitol Improvement Projects Bonds), to be lawful and valid. I have already indicated that I believe that only such bonds should be issued and sold as are necessary to make good the state's commitments to those who have started construction in reliance on those commitments.

DONWORTH, J., concurs with HILL, J.